2022 IL App (1st) 200749

FIRST DISTRICT
THIRD DIVISION
March 2, 2022

No. 1-20-0749

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 91 CR 03741 |
| | ) | |
| ALEXIS GREEN, | ) | Honorable |
| | ) | Thomas J. Byrne, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE McBRIDE delivered the judgment of the court, with opinion.
Presiding Justice Gordon and Justice Ellis concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Alexis Green, appeals the trial court's denial of his motion for leave to file a *pro se* successive postconviction petition. Relying on recent case law following the United States Supreme Court's decision in *Miller v. Alabama*, 567 U.S. 460 (2012), and evolving societal standards governing the sentencing of youthful offenders, defendant argues on appeal that he has established cause and prejudice for the filing of an as-applied challenge. According to defendant, his 100-year sentence is an unconstitutional *de facto* life sentence under both the eighth amendment to the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11) because he was 20 years old and intellectually disabled at the time of the offense.

¶ 2    Defendant was charged with the January 1991 shooting death of Officer Eddie Jones Jr., as well as the attempted murder and armed robbery of Officer Dennis Dobson. For background, we provide the following evidence which was presented at defendant's bench trial.

"Officer Dobson testified that while on patrol on January 7, 1991, he and Officer Jones noticed six individuals, including defendant, exchanging packets for money in the area of 19th Street and Kedzie Avenue. The officers requested each of the individuals to approach their squad car. As Officer Dobson began a pat-down search, defendant fled northbound through an alley. Officer Jones immediately pursued defendant on foot while Officer Dobson followed in the car. Eventually, an off-duty police officer entered the chase and apprehended defendant. Officer Dobson searched defendant, but did not discover any weapons.

The officers hand-cuffed defendant, placed him in the back seat of the car and took him to the 10th District police station. During the return trip, defendant offered to 'give' the officers a drug dealer in exchange for his release. This offer was rejected. At the police station, Officer Jones searched defendant for a second time and determined that defendant was unarmed. Defendant again offered to give the officers a drug dealer, [whom] he now identified only as 'Sabu'. This time the officers agreed. The officers re-cuffed defendant with his hands in front of his body and placed him in the back seat of the squad car. Officer Jones sat in the passenger seat while Officer Dobson drove to the area of Madison Street and Pulaski Road.

Defendant directed the officers to 3931 West Monroe Street and identified a building which purportedly contained a cache of drugs. As Officer Jones recorded the address and other information, Officer Dobson headed the squad car back to the station. At that moment, Officer Dobson heard a loud bang. He turned and saw Officer Jones jerk forward in the passenger seat and fall backwards.

Defendant, who was still sitting in the back seat of the squad car, ordered Officer Dobson to continue driving the vehicle. He then said 'f*** you' and, as with Officer Jones, shot Officer Dobson in the back of the head.

After reaching over the seat and searching the officers' pockets, defendant exited the vehicle, walked to the driver's front door, and took Officer Dobson's handgun. Defendant then said, 'You ain't s***,' spat on Officer Dobson and fled. Officer Dobson was later hospitalized and partially recovered; however. Officer Jones died at the scene." *People v. Green*, No. 1-93-2098, slip order at 2-3 (1995) (unpublished order under Illinois Supreme Court Rule 23).

¶ 3    The evidence at trial also included testimony from Katina Pickett and Kurt Anderson. Defendant was the father of one of Pickett's children. On January 7, 1991, Pickett woke defendant up at her house and defendant later left with a firearm. When Pickett returned home that evening, she had a conversation with defendant. Defendant admitted to her that he shot both of the police officers because he "wasn't going back to jail." Defendant then showed Pickett the firearm that had belonged to Officer Dobson. Anderson testified that defendant arrived at Anderson's home the evening of January 7, 1991. The men watched the news story about the shooting, and defendant admitted to Anderson that he shot the officers because he was afraid of going back to jail.

¶ 4    Sergeant Michael Chasen testified that defendant was arrested sometime after 11 p.m. on January 7, 1991. Sergeant Chasen spoke with defendant at approximately midnight that night. During the interview, defendant confessed to the crimes and explained the chain of events surrounding the shooting of Officers Jones and Dobson. Defendant also admitted that the officers had failed to recover a handgun he had hidden in the waistband of his pants. Assistant State's

Attorney (ASA) Allen Lynn testified that he was assigned to the case on January 7, 1991. He, along with Sergeant Chasen and another detective, questioned defendant at the police station on January 8. During the interview, defendant described the circumstances of the shooting, but defendant declined ASA Lynn's offer to memorialize his statement.

¶ 5     After all the evidence was presented, the trial court found the defendant guilty of the first degree murder of Officer Jones and the attempted first degree murder and armed robbery of Officer Dobson. The State sought the death penalty, and in May 1993, the trial court conducted defendant's bifurcated sentencing hearing. In the first part of the hearing, the trial court considered whether defendant was eligible for the death penalty. During this eligibility portion, the State introduced defendant's birth certificate, verifying that defendant was born on August 18, 1969. The parties also stipulated that defendant was 23 years old at the time of the sentencing hearing. At the conclusion of the eligibility portion, the court found defendant eligible for the death penalty.

¶ 6     During the second phase of the sentencing hearing, the parties presented evidence in aggravation and mitigation. Thomas Morgan testified in aggravation. He was employed as a probation officer with the juvenile court in Cook County. He was previously assigned to defendant's case in 1983. He testified that defendant's date of birth was August 18, 1969. Morgan investigated two juvenile petitions for defendant involving residential burglary. Defendant was committed to the juvenile division of the Department of Corrections for both petitions. Morgan was also aware of two prior juvenile petitions involving burglaries. He further knew of two pending petitions when defendant was committed to the Department of Corrections, for a total of six juvenile cases. Morgan testified, that in his opinion, defendant broke the law for money. Morgan thought defendant was "quite bright" based on how defendant responded to

4

questions and how he spoke, but defendant did not regularly attend school.

¶ 7 Officer Charles Burger testified about his contact with defendant in November 1985. The officer observed a parked vehicle with two young people who were potentially violating curfew. He identified defendant as the driver of the vehicle. Officer Burger subsequently learned the vehicle was stolen, and defendant was charged with trespass to a vehicle. While being processed for the arrest, defendant indicated his date of birth was August 18, 1967. Officer Burger admitted the case was later stricken off leave.

¶ 8 Officer Michael Jones testified that on May 7, 1987, he received a notification of a suspected stolen vehicle in a vacant lot. He approached and observed defendant behind the wheel. Defendant was subsequently charged with possession of a stolen motor vehicle.

¶ 9 Officer Joseph Scardino testified that on May 15, 1987, he observed a vehicle that was parked and the engine was running. He checked the license plate and the vehicle came back stolen. The officer then arrested the occupants of the vehicle. He identified defendant as the driver of the vehicle. Defendant was charged with possession of a stolen motor vehicle. Officer Scardino was unaware of the disposition of the case and was never called to testify.

¶ 10 Officer John O'Donovan testified that in November 1987, he observed a vehicle being driven with no license plates and the door lock had been pulled. He then activated his squad car emergency equipment and pulled the vehicle over. The occupant of the vehicle fled from the driver's door. Officer O'Donovan chased the individual and placed him under arrest. He identified defendant as the person he apprehended. Defendant was subsequently charged with possession of a stolen motor vehicle. The officer later testified at a bench trial. The State submitted evidence from the bench trial indicating that defendant was found guilty and sentenced to three years in the Department of Corrections. The State also submitted a certified copy of

conviction from a different case in which defendant pled guilty in October 1989 to possession of a controlled substance and sentenced to two years in the Department of Corrections.

¶ 11     Dr. George Savarese testified in mitigation. He was a licensed clinical social worker and was self-employed with a clinical and consultation practice providing psychotherapy. He was retained by the public defender's office to work on defendant's case to develop a comprehensive psychosocial development history of defendant's life. For his report, Dr. Savarese interviewed defendant for approximately 15 hours on multiple occasions. He also interviewed members of defendant's family as well as a corrections officer and the clerk at defendant's former high school. He reviewed defendant's juvenile court records, his adult criminal record, his corrections history, and his education records.

¶ 12     Dr. Savarese detailed defendant's developmental history. Defendant's father left the family before defendant was born. He stated that defendant was born August 18, 1969. When defendant was eight months old, he fell off of a bed and hit his head. He developed a blood clot at the back of his head, and his mother refused to allow surgery because defendant's skull had not been cracked. Dr. Savarese explained that the head injury impacted defendant's ability to control his impulses, his concrete thinking, and his sense of purpose in his actions. Defendant suffered another head injury playing football when he was 11. He was knocked unconscious for 5 to 10 minutes. When defendant was 13, the Department of Children and Family Services (DCFS) filed charges against his mother for abuse and neglect, but the charges were later dismissed.

¶ 13     When defendant was 13 and 14, he engaged in theft and burglaries. He was sent to the Illinois Youth Center in February 1984. A psychological evaluation revealed that defendant had an IQ of 71, which identified him as intellectually disabled. Defendant was released in October

1984, but was sent back a month later after committing a residential burglary. At 18, defendant suffered a third head injury during a snowball fight. The injury caused a lump on the back of his head, which defendant indicated was still there. Dr. Savarese noted that after 1989, defendant was considered a minimal security risk and sent to a minimum security prison as a low escape risk. He applied for work release in 1990, which was granted.

¶ 14    Dr. Savarese opined that defendant's deficits in intelligence, psychological functions, and social development were cumulative and were "not specific to any of the times in which the problems" arose. The cumulative effects included extremely low self-esteem, impaired judgment for problem solving, and lack of positive parental guidance or role models. These effects "increasingly created a difficult adjustment in terms of living a socially responsible lifestyle." He found that defendant suffered from physical and psychological neglect and abuse, intellectual disability, organic brain impairment, emotional deprivation, and severe emotional stress in his childhood.

¶ 15    Dr. Linda Wetzel testified that she was a licensed clinical psychologist with West Side Veteran Affairs Hospital. She was hired by defendant's counsel to conduct a neuropsychological evaluation of defendant. She met with defendant on two occasions for a total of five to six hours. Based on her evaluation, Dr. Wetzel concluded that defendant was intellectually disabled with an IQ of 74 and mildly to moderately brain damaged. Her testing also showed that defendant's ability to learn was severely impaired due to significant deficits in attention and concentration and impaired mental flexibility. Dr. Wetzel found defendant was disabled in his capacity to determine and organize the steps and elements needed to achieve a goal and his behavior was largely controlled by impulsive response to his immediate environment. Defendant required external controls and did better in a structured, supervised environment, such as prison.

¶ 16    Following the hearing, the trial court found that while defendant was eligible for the death penalty, mitigating evidence of his lack of prior violent crimes and his intellectual disabilities precluded its imposition. The court further declined to impose a natural life sentence because defendant's actions did not legally meet the definition of "brutal or heinous behavior indicative of wanton cruelty."

¶ 17    In determining the appropriate sentencing term, the court observed that defendant's "despicable and cowardly actions *** cry out for a great punishment." The court found that the extended term statute was applicable and allowed for a term up to 100 years, which the court found was the maximum the legislature had authorized. The court stated that this was the "proper sentence" and recognized an aspect of sentencing, "to punish the evil that occasionally spring from our fellow man."

¶ 18    The trial court reasoned,

> "If one wishes to dwell on punishment for punishment's sake, what motivated [defendant] to shoot Officers Jones and Dobson? Fear of returning to prison? Can there be a more fitting punishment than to send [defendant] there to the one place he so desperately wanted to avoid, and for what is practically speaking will be until the end of his life."

The court subsequently sentenced him to an extended 100-year prison term for murder, a 30-year prison term for attempted murder, and a 30-year prison term for armed robbery, all to be served concurrently. Because the offenses were committed before the truth-in-sentencing statute was enacted, defendant is therefore eligible for day-for-day credit, allowing defendant to serve 50 years of his sentence. We affirmed the judgment and sentence on direct appeal. *Green*, No. 1-93-2098.

¶ 19    Defendant has subsequently sought postconviction relief multiple times. In December 2000, defendant filed his first *pro se* postconviction petition, which the trial court summarily dismissed in March 2001. This court affirmed the dismissal on appeal. *People v. Green*, No. 1-01-1477 (2003) (unpublished order under Illinois Supreme Court Rule 23). In April 2005, defendant filed a *pro se* petition for relief from judgment pursuant to section 2-1401 of the Code of Civil Procedure (Code) (735 ILCS 5/2-1401 (West 2004)). The trial court recharacterized the petition as a successive postconviction petition and summarily dismissed the petition in June 2005. On appeal, this court vacated the order recharacterizing the petition and remanded for further proceedings. *People v. Green*, No. 1-05-2444 (2007) (unpublished order under Illinois Supreme Court Rule 23). On remand, the trial admonished defendant about the consequences of recharacterizing his petition and allowed him the opportunity to amend or withdraw the petition. Defendant filed an amendment, and the trial court summarily dismissed the petition in November 2007. On appeal, this court granted appellate counsel's motion to withdraw pursuant to *Pennsylvania v. Finley*, 481 U.S. 551 (1987), and affirmed the trial court's judgment. *People v. Green*, No. 1-08-0351 (2009) (unpublished order under Illinois Supreme Court Rule 23).

¶ 20    In November 2014, defendant filed a *pro se* petition pursuant to section 2-1401 of the Code, alleging that his sentence was void because he did not receive notice in the indictment of sentence enhancing facts and he was not advised of his right to elect to be sentenced under the law in effect at the time of sentencing rather than at the time of the offense. In January 2015, the trial court found that defendant's claims were without merit and dismissed his petition. On appeal, this court granted appellate counsel's motion to withdraw pursuant to *Finley*, 481 U.S. 551, and affirmed the trial court's judgment. *People v. Green*, No. 1-15-1628 (2016) (unpublished summary order under Illinois Supreme Court Rule 23(c)).

¶ 21    In April 2016, defendant filed another *pro se* petition for relief from judgment under section 2-1401 of the Code seeking to correct an "erroneous voidable judgment," which he supplemented in July and September 2016. In January 2017, the State moved to dismiss defendant's petition, and the trial court subsequently granted the motion and dismissed the petition in February 2017. In March 2017, defendant filed a motion to vacate his conviction and sentence, and the State moved to dismiss this motion in May 2017, but defendant later withdrew this petition in September 2017. In December 2018, defendant filed another *pro se* petition to vacate his conviction and sentence, which the trial court dismissed in January 2019.

¶ 22    In October 2019, defendant filed the *pro se* motion for leave to file a successive postconviction petition at issue in this appeal. He argued in his motion that he satisfied cause based on the emerging case law relating to sentencing of juvenile defendants under the eighth amendment. He further asserted that he could demonstrate prejudice because the 100-year sentence imposed upon him at 20 years of age was a *de facto* life sentence and violated due process in violation of the eighth amendment. In his petition, defendant contended:

> "We need to look at the science of brain development. It has been found
> that the Frontal lobe of the brain doesn't development [*sic*] to an adult till 25
> years of age, causing anyone under 25 to be consider [*sic*] as a 'youthful offender'
> when commiting [*sic*] a crime.
>
> The judge errored [*sic*] in enhancing [defendant's] sentence to a *de facto*
> natural life sentence. He should of [*sic*] consider him as a youthful offender with a
> mind of a juvenile and not of an adult. Since he was 20 years old.
>
> Defendant not only had no history of violent crimes, it was established by
> several experts that his intelligence or lack thereof, placed him in a category

which could be considered [intellectually disabled].

> Intellectually disabled individuals, just like juveniles are less culpable, where the deficiencies associated with intellectual disability 'diminish their personal culpability.' [*Atkins v. Virginia*, 536 U.S. 304, 318 (2002)]."

Other than his own affidavit swearing the motion was true and correct, defendant did not attach any documentation in support of his petition.

¶ 23    In January 2020, the trial court found defendant did not establish the requisite prejudice and denied defendant's motion for leave to file his petition. Specifically, the court reasoned:

> "Petitioner contends that at sentencing, the court did not consider him as a youthful offender. Petitioner does not indicate any facts specific to him that demonstrate his youthfulness at the time of the offenses would warrant an extension of the Eight Amendment protections. Petitioner also indicates he had a diminished capacity by being considered [intellectually disabled] by several experts. Petitioner does not support this conclusory allegation with any further facts or evidence to demonstrate his diminished capacity at the time of the offense. The petition must contain specific factual allegations rather than conclusory statements. *People v. Stein*, 255 Ill. App. 3d 847, 848 (1993). It is the burden of petitioner to support factual allegations in the petition with affidavits, the record, or other evidence containing specific facts. *Id.* The conclusory unsupported allegations within the petition fail to meet the required burden under the [Post-Conviction Hearing] Act."

¶ 24    On appeal, defendant argues that the trial court erred in denying him leave to file his successive postconviction petition. He contends that he satisfied the cause and prejudice test

because the sentencing standards have changed for youthful offenders since his sentence was imposed. Based on these changes in case law, defendant asserts that since he was only 20 years old at the time of the offenses, his 100-year sentence violates the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution.

¶ 25    The Post-Conviction Hearing Act (Post-Conviction Act) (725 ILCS 5/122-1(a)(1) (West 2018)) provides a tool by which those under criminal sentence in this state can assert that their convictions were the result of a substantial denial of their rights under the United States Constitution or the Illinois Constitution or both. *People v. Coleman*, 183 Ill. 2d 366, 378-79 (1998). Only one postconviction proceeding is contemplated under the Post-Conviction Act (*People v. Edwards*, 2012 IL 111711, ¶ 22) and a defendant seeking to file a successive postconviction petition must first obtain leave of court (*People v. Tidwell*, 236 Ill. 2d 150, 157 (2010)). The bar against successive postconviction proceedings should not be relaxed unless (1) a defendant can establish "cause and prejudice" for the failure to raise the claim earlier or (2) he can show actual innocence under the "fundamental miscarriage of justice" exception. *Edwards*, 2012 IL 111711, ¶¶ 22-23; *People v. Smith*, 2014 IL 115946, ¶ 30.

¶ 26    Under the cause and prejudice test, a defendant must establish both (1) cause for his or her failure to raise the claim earlier; and (2) prejudice stemming from his or her failure to do so. *Edwards*, 2012 IL 111711, ¶ 22 (citing *People v. Pitsonbarger*, 205 Ill. 2d 444, 459 (2002)). The cause-and-prejudice standard is higher than the normal first-stage "frivolous or patently without merit" standard applied to initial petitions. *Edwards*, 2012 IL 111711, ¶¶ 25-29; *Smith*, 2014 IL 115946, ¶ 35.

> "[L]eave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by the

petitioner, that the claims alleged by the petitioner fail as a matter of law or where the successive petition with supporting documentation is insufficient to justify further proceedings." *Smith*, 2014 IL 115946, ¶ 35.

¶ 27　"A defendant shows cause 'by identifying an objective factor that impeded his or her ability to raise a specific claim during his or her initial post-conviction proceedings.' " *People v. Wrice*, 2012 IL 111860, ¶ 48 (quoting 725 ILCS 5/122-1(f) (West 2010)). In other words, to establish "cause" a defendant must articulate why he could not have discovered the claim earlier through the exercise of due diligence. *People v. Wideman*, 2016 IL App (1st) 123092, ¶ 72. In this case, defendant asserts and the State concedes that the requisite cause has been satisfied because the evolving case law involving the sentencing of youthful offenders was not available at the time of his prior petitions, which was several years before the United States Supreme Court issued *Miller*, 567 U.S. 460, and subsequent case law raised the possibility that youthful offenders could seek protection under *Miller*. See *People v. Harris*, 2018 IL 121932, ¶ 48. Because this developing authority did not exist at the time of his initial postconviction petition, we agree with the parties that defendant has established the requisite cause to file his successive postconviction petition.

¶ 28　We next consider whether defendant sufficiently established the requisite prejudice for the filing of his successive petition. A defendant shows prejudice by demonstrating that the claim so infected the trial that the resulting conviction or sentence violated due process. *Wrice*, 2012 IL 111860, ¶ 48. It is defendant's burden to establish a *prima facie* showing of both cause and prejudice in order to be granted leave before further proceedings on his claims can follow. See *People v. Bailey*, 2017 IL 121450, ¶ 24. Defendant contends that he has established prejudice because, under *Miller* and its progeny, the 100-year sentence imposed upon him as a 20-year-old

constitutes a *de facto* natural life sentence in violation of the eighth amendment of the United States Constitution (U.S. Const., amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The State responds that defendant cannot establish prejudice because (1) an eighth amendment sentencing challenge under *Miller* is limited to juvenile defendants and (2) defendant failed to allege any specific facts that would allow him to be viewed as equivalent to a juvenile and the trial court considered the *Miller*-related factors before imposing defendant's sentence. The State also notes that the record indicates defendant was 21 years old at the time of the offenses.

¶ 29     We agree that defendant's challenge under the eighth amendment has been foreclosed. Illinois courts have held that the eighth amendment is not implicated in the case of a defendant, aged 18 or over. The Illinois Supreme Court concluded that "for sentencing purposes, the age of 18 marks the present line between juveniles and adults." *Harris*, 2018 IL 121932, ¶ 61. Appellate panels have recognized and applied this conclusion consistently. See *People v. Ruiz*, 2020 IL App (1st) 163145, ¶ 32; *People v. Handy*, 2019 IL App (1st) 170213, ¶ 37; *People v. Herring*, 2018 IL App (1st) 152067, ¶ 103; *People v. Pittman*, 2018 IL App (1st) 152030, ¶ 31.

¶ 30     Turning to the proportionate penalties claim, defendant argues that he received a *de facto* life sentence without any consideration of the mitigating effects of his youth, as a 20-year-old, and thus, he has a viable claim that his sentence violates the proportionate penalties clause. Specifically, he contends that his background as set forth during the initial trial proceedings reflected his lack of maturity at the time of the offense. He focuses on testimony from a psychotherapist at his sentencing hearing that detailed two head injuries he suffered before age 11 and a third head injury when he was 18. Defendant also discusses his rough childhood, including abuse and neglect allegations investigated by DCFS and his juvenile criminal offenses

and subsequent time in custody. Defendant also points to testimony in the record from a psychologist about intellectual disabilities with mild to moderate brain damage. The State maintains that defendant cannot establish the requisite prejudice because he failed to allege that he possessed the same cognitive characteristics of a juvenile offender and therefore, his as-applied challenge under the proportionate penalties clause fails.

¶ 31    The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11; *People v. Rizzo*, 2016 IL 118599, ¶ 28.

¶ 32    The sentencing of juvenile and youthful offenders has been evolving in the country over the last several years. Beginning with *Roper v. Simmons*, 543 U.S. 551 (2005), the United States Supreme Court weighed in and set forth new constitutional parameters for the sentencing of juvenile offenders. See also *Graham v. Florida*, 560 U.S. 48 (2010); *Miller*, 567 U.S. 460; *Montgomery v. Louisiana*, 577 U.S. 190, 211-12 (2016). "[T]he United States Supreme Court has advised that 'children are constitutionally different from adults for purposes of sentencing.' " *People v. Lusby*, 2020 IL 124046, ¶ 32 (quoting *Miller*, 567 U.S. at 471). "The Court outlawed capital sentences for juveniles who commit murder in *Roper* and capital sentences for juveniles who commit nonhomicide offenses in *Graham*. And in *Miller*, the Court barred mandatory life sentences for juveniles who commit murder." *Id. Miller* has since been held to apply retroactively. *Montgomery*, 577 U.S. at 211-12; see also *People v. Holman*, 2017 IL 120655, ¶ 38 (recognizing that *Miller* applied retroactively).

¶ 33    Since *Miller*, the Illinois Supreme Court has suggested similar sentencing challenges are viable for youthful offenders, *i.e.*, defendants who are young, but legal adults. See *People v.*

*Thompson*, 2015 IL 118151, ¶¶ 43-44 (finding that a 19-year-old defendant was not necessarily foreclosed from raising an as-applied in the trial court and observing that the Post-Conviction Act was designed to resolve such constitutional claims); *Harris*, 2018 IL 121932, ¶ 48 (concluding that the 18-year-old defendant's as-applied proportionate penalties challenge was "more appropriately raised" in a postconviction proceeding rather than on direct appeal).

¶ 34      Defendant's primary claim is that because he was 20 years old at the time of the offenses, he is entitled to *Miller* protections as a youthful offender. However, whether defendant was 20 years old at the time of the offenses or whether he was actually 21 years of age is a crucial question because both parties discussed the growing case law considering youthful offenders under the age of 21. Therefore, we must first determine defendant's age when the offenses occurred in January 1991. We do so by considering the following.

¶ 35      During the death penalty proceedings, the State was required to establish defendant was over 18 years of age at the time of the commission of the offenses to be eligible for the death penalty. At defendant's May 1993 death eligibility hearing, defendant's birth certificate, which was admitted into evidence without objection, provided that defendant was born on August 18, 1969. The parties also stipulated that defendant was 23 years old at the time of the sentencing hearing. Defendant's own mitigation witnesses, Drs. Savarese and Wetzel indicated either in their testimony or their reports that defendant's birth date was August 18, 1969. Additionally, the current inmate profile on the Department of Corrections website lists defendant's date of birth as August 18, 1969. See *People v. Gipson*, 2015 IL App (1st) 122451, ¶ 66 (finding this court may take judicial notice of the Department of Corrections website). Defendant's presentence investigation report (PSI) also lists that his birth date was August 18, 1969. Defendant has offered no competent evidence to establish that his birth date is anything other than August 18,

1969. Based upon all of the above, we conclude that defendant's claim that he was 20 years old at the time of the offenses is completely inaccurate and must be rejected. We find that defendant was 21 years of age when he shot and killed Officer Jones and attempted to kill Officer Dobson and robbed him of his service weapon.

¶ 36     While defendant relies on several cases to support his *Miller* claim, none involved a defendant who was 21 years old or older but instead considered proportionate penalties claims advanced by defendants who were 18 or 19 years old at the time they committed the offenses. See *People v. Minniefield*, 2020 IL App (1st) 170541; *People v. Carrasquillo*, 2020 IL App (1st) 180534; *People v. Franklin*, 2020 IL App (1st) 171628; *People v. Johnson*, 2020 IL App (1st) 171362; *People v. Bland*, 2020 IL App (3d) 170705; *Ruiz*, 2020 IL App (1st) 163145; *People v. Glinsey*, 2021 IL App (1st) 191145.

¶ 37     In contrast, several recent cases have addressed *Miller* claims by defendants aged 21 and over. In *People v. Humphrey*, 2020 IL App (1st) 172837, ¶ 1, the defendant filed a successive postconviction petition, alleging that his natural life sentence for crimes committed when he was 21 violated of the proportionate penalties clause. The reviewing court similarly observed that the defendant could "point to no case in which an Illinois court has recognized that a life sentence imposed on a young adult—21 or older as [the defendant] was—is unconstitutional as applied to that offender under the proportionate penalties clause." *Id.* ¶ 33. "The evolving science on brain development may support such claims at some time in the future, but for now individuals who are 21 years or older when they commit an offense are adults for purposes of a *Miller* claim." *Id.* The *Humphrey* court reasoned:

> "While 21 is undoubtedly somewhat arbitrary, drawing a line there is in
> keeping with other aspects of criminal law and society's current general

17

recognition that 21 is considered the beginning of adulthood. In Illinois, a person under the age of 21 when he or she commits first degree murder is now eligible for parole review after serving 20 or more years of his or her sentence. 730 ILCS 5/5-4.5-115 (West Supp. 2019). The Illinois legislature has also prohibited the sale of nicotine and tobacco products to persons under 21 (720 ILCS 675/1 (West Supp. 2019)), prohibited the sale of alcohol products to persons under 21 (235 ILCS 5/6-16 (West 2016)), and made possession of a firearm by those under the age of 21 an aggravating factor for aggravated unlawful use of a weapon (720 ILCS 5/24-1.6(a)(1), (a)(3)(I) (West 2016))." *Id.* ¶ 34.

¶ 38 The reviewing court further pointed out that even if there was some basis for an individual aged 21 or older at the time of the offense to raise an as applied *Miller*-type claim under special circumstance, the defendant's circumstances would not satisfy that basis. The court noted that the defendant was an active participant in the crimes and had prior violent crimes, and he received a discretionary sentence, with the court finding he was beyond rehabilitation. *Id.* ¶ 35. The *Humphrey* court concluded that "under the current state of the law, [the defendant's] claim cannot meet the cause-and-prejudice standard for an as-applied challenge under either the eighth amendment or the proportionate penalties clause." *Id.* ¶ 36.

¶ 39 In *People v. Rivera*, 2020 IL App (1st) 171430, ¶ 1, the defendant filed a successive postconviction petition seeking *Miller* protections for youthful offenders because he received a sentence of 55 years for first degree murder and armed robbery committed when he was 23. In reviewing the defendant's proportionate penalties claim, the *Rivera* court found that any arguments that could be made based on the statutes and cases relating to defendants under the age of 21 were not applicable. *Id.* ¶ 26. The court observed that the defendant's actions "set forth

none of the immaturity or impetuosity that are the hallmarks of youth," noting his prior felony convictions for drug trafficking and gun possession, as well as the commission of the crimes at issue occurred shortly after the defendant's release from prison. *Id.* The reviewing court concluded that if an extension of *Miller* protections should be made for defendants over the age of 21, then it should be made by our legislature or our supreme court. *Id.* ¶ 27. "The supreme court and the legislature are in a better position to draw clear, predictable and uniform lines for our state." *Id.*; see also *People v. Kruger*, 2021 IL App (4th) 190687, ¶ 32 (agreeing with the *Humphrey* court's limitation of *Miller*-based claims to defendants 18 to 20 years old and any further extension should be made by either the legislature or the supreme court).

¶ 40    Similarly, in *People v. Suggs*, 2020 IL App (2d) 170632, ¶¶ 30-44, the reviewing court affirmed the summary dismissal at the first stage of an initial postconviction petition where the defendant, who was 23 years old at the time of his offense, raised eighth amendment and proportionate penalties challenges to his *de facto* life sentence. The *Suggs* court noted that although "society has drawn lines at ages 18 and 21 for various purposes," the defendant failed to "point to any line, societal, legal, or penological, that is older than 21 years." *Id.* ¶ 35. The reviewing court concluded while it may seem "but a short step" to apply the *Miller* factors to an 18-year-old offender, "it is a much greater leap to extend [them] to a 21-year-old, and an even greater leap to apply [them] to a 23-year-old," such as the defendant in that case. *Id.*[1]

---

[1]    Though not cited by defendant, we acknowledge the decision in *People v. Savage*, 2020 IL App (1st) 173135, but find it distinguishable from this case. There, the defendant appealed the first stage dismissal of his initial postconviction petition. The reviewing court found that the 22-year-old defendant satisfied the lower gist standard where the defendant's detailed factual

¶ 41 Further, as defendant observed, the General Assembly, in response to this emerging case law, enacted several statutes addressing youthful offenders under the age of 21. In addition to addressing the growing case law regarding youthful offenders, the legislature firmly established the line between a young adult offender entitled to sentencing protection and adult offenders. Section 5-4.5-115 of the Unified Code of Corrections created a parole review for offenders under the age of 21 at the time of the offense. See 730 ILCS 5/5-4.5-115 (West 2020). Under this statute, a person convicted of first degree murder is eligible for parole after serving only 20 years, if he or she was under 21 years old at the time of the offense and was sentenced after the law took effect. *Id.* § 5-4.5-115(b). Additionally, the Juvenile Court Act of 1987 defines a " '[m]inor' " as "a person under the age of 21 years subject to this Act" (705 ILCS 405/1-3(10) (West 2018)), while an " '[a]dult' means a person 21 years of age or older" (*id.* § 1-3(2)). Thus, under this statutory scheme, defendant was an adult at age 21. It is also worth noting that under the current sentencing requirements, the murder of a police officer mandates the imposition of a mandatory sentence of natural life without the possibility of parole for a defendant over the age of 18. See 730 ILCS 5/5-8-1(a)(1)(c)(iii) (West 2020); *id.* § 5-4.5-115(b).

¶ 42 We find the reasoning in *Humphrey*, *Rivera*, and *Suggs* control. As these cases and the recent statutes have established, the line of adulthood has been drawn at age 21. In the present case, defendant was 21 years old at the time of the offense, and therefore was an adult for

---

allegations that his brain was more like that of a juvenile was supported by the record. *Id*. ¶ 72. In contrast, defendant here was required to satisfy the higher cause and prejudice test by detailing how his brain was more akin to that of a juvenile and supporting his claim with sufficient documentation.

purposes of a *Miller* claim. See *Humphrey*, 2020 IL App (1st) 172837, ¶ 33; 705 ILCS 405/1-3(2) (West 2018).

¶ 43    Moreover, defendant's actions were not those of a young adult, but a seasoned criminal seeking to avoid prison. Defendant was apprehended after officers observed what appeared to be a drug transaction. Defendant fled and was detained. Once in a police car, defendant retrieved a hidden firearm and shot two police officers in the back of their heads, killing one. He then fled after stealing one of the officer's service weapon. He later confessed to two individuals that he shot the officers because he did not want to return to prison. While defendant's criminal history was not violent, it was extensive. As a juvenile, defendant was arrested six times for residential burglary and burglary, including time in juvenile detention. Defendant's prior adult convictions included possession of a stolen motor vehicle and possession of a controlled substance that both resulted in two separate incarcerations in the Department of Corrections. Defendant's significant criminal history demonstrates that his actions were not akin to a juvenile but show his repeated decision to violate the law which escalated to the execution-style murder of Officer Jones and the attempted murder and armed robbery of Officer Dobson.

¶ 44    Even assuming that a 21-year-old defendant could be considered a youthful offender, which we do not find, defendant has failed to set forth sufficient support for his claim that his brain was more like a juvenile than an adult. Defendant argues that he should be allowed to develop the record on his claim that "he was more like an adolescent than an adult at the time of the offense and should have been treated as such at sentencing." Defendant's petition provided only a general discussion of the emerging case authority for youthful offenders as well as research on the brain development of young adults. Regarding his own claim, defendant offered only bare statements that the trial court erred in sentencing him without considering defendant

"as a youthful offender with a mind of a juvenile and not of an adult." In support, defendant

referred only to his lack of prior violent crimes and intellectual disabilities. As stated above,

defendant did not attach any documentation or evidence to his petition.

¶ 45    The recent decisions in *People v. White*, 2020 IL App (5th) 170345, and *People v. Moore*,

2020 IL App (4th) 190528, assist our consideration of defendant's prejudice claim where he does

not discuss how his brain was more akin to that of an adolescent. In *White*, the Fifth District

addressed the denial of a motion for leave to file a successive postconviction petition in

circumstances similar to those in the present case: the assertion by a defendant that his natural

life sentences violated the eighth amendment of the United States Constitution (U.S. Const.,

amend. VIII) and the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970,

art. I, § 11) as applied to him because he was " 'a 20 year old minor' " when the murders

occurred, and the trial court did not consider his youth and rehabilitative potential. *White*, 2020

IL App (5th) 170345, ¶ 13. There, the defendant received a mandatory natural life sentence

following his convictions for the murder of his grandmother and her friend. *Id.* ¶¶ 4-5.

¶ 46    In support of his proportionate penalties claim, the defendant argued that "recent social

science research demonstrates that the trial court should have been permitted to consider his age

and its attendant characteristics prior to imposing the mandatory life sentence." *Id.* ¶ 23. He

further contended that the reviewing court need not reach the merits of his claim but rather

"should allow him the opportunity to develop his claim, with the assistance of appointed counsel,

as to whether *Miller* can apply to a 20-year-old for proportionate penalties purposes." *Id.* ¶ 24.

The *White* court rejected the defendant's contention and found that "a flat allegation as to

evolving science on juvenile maturity and brain development is simply insufficient." *Id.* (citing

*Tidwell*, 236 Ill. 2d at 161 (a defendant seeking leave to institute a successive postconviction

"must submit enough in the way of documentation to allow a circuit court to" determine whether leave should be granted)). The reviewing court observed that "[o]ther than generally asserting studies that show that sometimes youthfulness can extend into a person's twenties, the defendant does not now allege how he was particularly affected by any immaturity." *Id.* The court also found that the defendant's allegations relating to his family history did "not rise to the level of special circumstances that would provide a compelling reason to advance his successive postconviction petition." *Id.*

¶ 47 The Fifth District concluded "the evidence established that the defendant was the principal offender and was far from minimally culpable." *Id.* ¶ 28. Given his status as an adult principal offender, a mandatory sentence of natural-life imprisonment did not shock the moral sense of the community and did not violate the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 29. The reviewing court reiterated that the defendant could not "establish the necessary prejudice because his claims are legally meritless, his factual assertions unsupported, and his successive petition is insufficient to justify further proceedings." *Id.* ¶ 31.

¶ 48 Following *White*, the Fourth District reached the same conclusion in *Moore*, 2020 IL App (4th) 190528. There, the defendant, who was 19 years old at the time of the offense, was convicted of first degree murder with the aggravated finding of felony murder and received a sentence of natural life. *Id.* ¶¶ 4-5. He later filed a motion for leave to file his successive postconviction petition arguing that his natural life sentence was unconstitutional because it violated the eighth amendment of the United States Constitution and the Illinois Constitution's proportionate penalties clause based on *Miller*. *Id.* ¶ 9.

¶ 49 In support of his proportionate penalties claim, the defendant asserted that his petition "must advance for further proceedings" because his natural life sentence denied him the

23

opportunity to be rehabilitated to a useful citizen even though he was a youthful offender. *Id.* ¶ 32. He maintained that he be given the opportunity to develop the record to determine whether the protections of *Miller* apply to him as a 19-year-old offender. *Id.* ¶ 38. The State responded that the defendant could not make a *prima facie* showing of prejudice because the defendant "failed to plead sufficient facts to support his claim he should be treated similarly to a juvenile offender." *Id.* ¶ 32. The Fourth District, following *White*, rejected the defendant's bare claim without any support. The *Moore* court acknowledged that although the defendant had limited means while in prison, "the standard for successive postconviction petitions is higher than initial petitions, and a defendant is required to provide sufficient documentation." *Id.* ¶ 40. Therefore, the court concluded that the defendant's simple "assertion a 19-year-old's brain is more like a 17-year-old adolescent's in terms of development is simply insufficient to survive the more exacting standard that would warrant the filing of a successive postconviction petition." *Id.*

¶ 50    We find both *White* and *Moore* to be instructive. In the present case, defendant's motion for leave to file his successive petition simply claimed that he established sufficient prejudice because he "was sentenced to 100 years and was 20 years old." As discussed above, defendant's petition offered a general statement that the trial court should have considered him as a youthful offender and relied only on his lack of violent criminal history and his intellectual disabilities. This is not sufficient to set forth a *prima facie* showing of prejudice to warrant further proceedings. As in *White* and *Moore*, defendant here failed to provide any evidence to support his general statement that *Miller* and its progeny are applicable to him. While he cites to studies on the brain of young adults, defendant did not provide any details connecting those studies to his own brain beyond his alleged intellectual disabilities. Defendant has not asserted how his youth impacted his actions in firing a gun that killed one police officer and severely injured

another officer in an attempt to avoid further incarceration. Given defendant's actions and absent any details of how his age impacted those actions, his *de facto* natural life sentence of 100 years does not shock the moral sense of the community and does not violate the proportionate penalties clause of the Illinois Constitution.

¶ 51     Additionally, to the extent that defendant relies on his intellectual disabilities to support his sentencing claim, the Illinois Supreme Court recently foreclosed this argument in *People v. Coty*, 2020 IL 123972. In that case, the defendant, a 46-year-old, intellectually disabled adult, received a statutorily mandated natural life sentence after his second conviction for a sexual offense against a child pursuant to section 12-14.1(b)(2) of the Criminal Code of 1961 (720 ILCS 5/12-14.1(b)(2) (West 2004)). *Coty*, 2020 IL 123972, ¶ 3. In that decision, the appellate court had extended the protections of *Miller* to include intellectually disabled adults based on *Atkins v. Virginia*, 536 U.S. 304 (2002), which held that the eighth amendment barred the execution of mentally disabled defendants. *People v. Coty*, 2018 IL App (1st) 162383, ¶¶ 69-77.

¶ 52     The Illinois Supreme Court disagreed. It held that, although *Miller* is based in part on the lesser culpabilities of youth, characteristics those with intellectual disabilities tend to share, "the *Miller* Court's decision is founded, principally, upon the *transient* characteristics of youth, characteristics not shared by adults who are intellectually disabled." (Emphasis in original.) *Coty*, 2020 IL 123972, ¶ 39. The supreme court observed:

> "With respect to culpability, we consider and take as a given the characteristics of the intellectually disabled that the Supreme Court has identified as relevant to sentencing in the context of capital sentencing, emphasizing at the outset that whether a defendant is subject to execution is a very different issue than whether a mandatory natural life sentence is constitutionally permissible for

an adult." *Id.* ¶ 33.

¶ 53    Given the static nature of an intellectual disability, the court found a reduced probability

of rehabilitation. *Id.* ¶¶ 37-40. As the court noted, "unlike a juvenile, whose mental development

and maturation will eventually increase that potential, the same cannot generally be said of the

intellectually disabled over time." *Id.* ¶ 37. "The rehabilitative prospects of youth do not figure

into the sentencing calculus" for an intellectually disabled adult defendant. *Id.* ¶ 40. The *Coty*

court concluded that the intellectually disabled defendant's initial mandatory natural life

sentence was not unconstitutional as applied to him. *Id.* ¶ 42.

¶ 54    Having found that the defendant's life sentence did not violate the proportionate penalties

clause, the court also concluded that "if a sentence passes muster under the proportionate

penalties clause, *** then it would seem to comport with the contemporary standards of the

eighth amendment." *Id.* ¶ 45. As the *Coty* court observed, "[c]ourts across the country that have

addressed the issue *** have declined to extend *Atkins* to noncapital sentences or *Miller* to the

intellectually disabled." (Internal quotation marks omitted.) *Id.*

¶ 55    In his reply brief, defendant seeks to distinguish *Coty* and its holding. He contends that

unlike the 46-year-old defendant in *Coty*, he was only 20 or 21 years old at the time of the

offense and he was "not an incorrigible, serial sex offender." However, multiple appellate panels

have declined to depart from *Coty* on this basis.

¶ 56    The Third District, in *People v. Clark*, 2021 IL App (3d) 180610, *appeal allowed*, No.

127273 (Ill. Sept. 29, 2021), rejected a defendant's assertion that *Coty* was distinguishable

because the defendant was 24 years of age. In that case, the defendant pled guilty but mentally ill

to first degree murder and robbery in December 1993. The trial court subsequently sentenced the

defendant to an extended term of 90 years' imprisonment for first degree murder because the

victim was over 60 years old and 15 years' imprisonment for robbery to be served consecutively. *Id.* ¶¶ 3-4. In 2018, the defendant sought leave to file a successive postconviction petition arguing that his sentence was unconstitutional because "newly discovered evidence in the fields of neurobiology and developmental psychology showed that his brain was not fully developed at the time of his offense." *Id.* ¶ 7. The trial court found that the defendant failed to show the requisite cause and prejudice and denied leave. *Id.*

¶ 57    On appeal, the defendant argued that he set forth the necessary cause and prejudice to file a successive postconviction petition because "the case law surrounding intellectually disabled emerging adults has changed drastically since he was sentenced." *Id.* ¶ 9. The reviewing court found that the defendant could not establish prejudice because his sentence was not unconstitutional under *Coty*. *Id.* ¶ 13. The defendant conceded that *Coty* controlled but contended that his age and offense were distinguishable from *Coty*. The *Clark* court disagreed and held:

> "We do not accept defendant's invitation to parse the *Coty* decision by distinguishing between a 24-year-old intellectually disabled defendant who committed first degree murder and robbery and a 46-year-old intellectually disabled defendant who was twice convicted for sexual offenses against children. The *Coty* court held that '[w]hile defendant may be less culpable, because of his disability, *** the characteristics of his predominantly static condition and his age make him less likely to be rehabilitated and thus more likely to reoffend.' [*Coty*, 2020 IL 123972], ¶ 42. The same is true of defendant in the instant case, whose intellectual disabilities limit his rehabilitative potential and increase his likelihood of reoffending." *Id.*

¶ 58    In *People v. Robinson*, 2021 IL App (1st) 192289, this court similarly declined to

distinguish *Coty*. There, the defendant was found guilty of aggravated kidnapping and aggravated criminal sexual assault when he was 24 years old. The defendant was subject to a mandatory natural life sentence due to a prior conviction for criminal sexual assault, with a concurrent term of 20 years for aggravated kidnapping. *Id.* ¶ 1.

¶ 59 On appeal, the defendant argued that his mandatory natural life sentence violated the proportionate penalties clause of the Illinois Constitution as applied to him because his documented mental illnesses showed a diminished capacity and greater possibility for rehabilitation. *Id.* ¶ 38.

¶ 60 The reviewing court observed, citing *Humphrey* and *Rivera*, that at age 24, the defendant was an adult and "well past both the juvenile cutoff for eighth amendment *Miller*-based claims and the 18-to-21-year-old group of defendants who have asserted as-applied *Miller*-based claims under the proportionate penalties clause." *Id.* ¶ 48. However, the defendant argued that *Miller* should be expanded to apply to him based on mental illnesses and asserted that the principles set forth in *Coty* supported his argument that his sentence was unconstitutional. *Id.* ¶¶ 49-50.

¶ 61 However, the *Robinson* court declined to distinguish *Coty* and expand *Miller* protections to the defendant. The court found no reason to hold that the existence of his mental illnesses was an inherently mitigating factor such that application of the mandatory life sentence would violate the proportionate penalties clause. *Id.* ¶ 57. The court further observed that "nothing in the records that defendant presented provided any basis for finding that defendant had an increased possibility for rehabilitation because his mental health conditions are 'treatable.' " *Id.* ¶ 58. The reviewing court pointed out that despite the mandatory life sentence, the trial court considered all mitigating factors related to the defendant's culpability and rehabilitative potential, including his difficult upbringing and struggles with psychological problems. Accordingly, the *Robinson* court

concluded that the defendant's mandatory life sentence did not shock the moral sense of the community in violation of the proportionate penalties clause and his sentencing claim failed. *Id.* ¶¶ 62-64.

¶ 62    Here, as in *Clark*, we decline to distinguish *Coty*'s holding based on age and offense. The supreme court's analysis in *Coty* did not limit its holding to the facts before it, but rather, observed that mental disabilities are a "predominately static condition." *Coty*, 2020 IL 123972, ¶ 42. The evidence at defendant's sentencing hearing indicated that his condition was static, and his disability would not diminish. Thus, as in *Coty* and *Clark*, defendant's intellectual disability "limit[s] his rehabilitative potential and increase[s] his likelihood of reoffending." *Clark*, 2021 IL App (3d) 180610, ¶ 13. Therefore, in light of *Coty*, we reject any claim by defendant that *Miller* protections should be extended to his case due to his intellectual disabilities.

¶ 63    Finally, assuming *arguendo* that we reach the merits of defendant's claim, his argument is premised on the same allegations he presented to the trial court and raised on direct appeal. While defendant has referred to the recent studies concerning the brain development of young adults, as discussed above, he offered no supporting documentation or analysis regarding his own brain development. Rather, he contends that the trial court should have been allowed to consider his intellectual disabilities as well as his lack of prior convictions for violent crimes. In his direct appeal, defendant asserted that "the trial court erred in imposing a 100 year sentence for the murder of Officer Jones due to the fact that defendant was [intellectually disabled] and had no previous history of violent crimes." *Green*, No. 1-93-2098, slip order at 10. Another panel of the First District rejected defendant's claim and found that the trial judge:

> "did not abuse his discretion in sentencing defendant to 100 years of
> imprisonment for the execution style murder of Officer Jones. Moreover, we note

that [the trial judge] declined to impose the death penalty based upon defendant's mental capacity as well as his lack of a violent criminal history. Clearly, [the judge] had considered these mitigating factors in rendering his sentence." *Id.* at 11.

¶ 64 At sentencing, the trial judge was tasked with determining whether defendant should receive the death penalty or a lesser sentence based on mitigating factors. The trial judge specifically observed that he was required to consider statutory mitigating factors, including that " 'the defendant has no significant history of prior criminal behavior' " as well as "the caveat in the statute that [said he] must consider 'any mitigating factors which are relevant to the imposition of the death penalty.' " The judge reviewed defendant's PSI on the record and found that defendant "has never even been arrested for a crime of violence, either as a juvenile or as an adult." Thus, the trial judge explicitly considered defendant's lack of prior violent crimes as a mitigating factor in his sentence.

¶ 65 The trial judge also considered the findings of two experts, Drs. Savarese and Wetzel, who each independently found defendant to be intellectually disabled with brain damage. The judge further found that defendant's actions did not meet the statutory definition of "brutal or heinous behavior indicative of wanton cruelty," which was a required finding to impose a natural life sentence. The judge then imposed an extended term sentence of 100 years. As previously noted, defendant's sentence was subject to day-for-day credit, for a total term to be served of 50 years. See Ill. Rev. Stat. 1991, ch. 38, ¶ 1003-6-3(a)(2) ("Such rules and regulations shall provide that the prisoner shall receive one day of good conduct credit for each day of service in prison other than where a sentence of 'natural life' has been imposed.").

¶ 66 We agree with the panel from defendant's direct appeal that the trial judge clearly and

explicitly considered his criminal history as well as his intellectual disabilities in determining the appropriate sentence. Therefore, defendant's claim based on these two mitigating factors lacks merit. Absent any allegations related to defendant's particular circumstances regarding his brain development at the time of the offense, defendant failed to set forth a *prima facie* claim of prejudice as required to be granted leave to file his successive petition. Accordingly, the trial court properly denied defendant's motion for leave to file his successive postconviction petition.

¶ 67    Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 68    Affirmed.

**No. 1-20-0749**

| | |
|---|---|
| **Cite as:** | *People v. Green*, 2022 IL App (1st) 200749 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 91-CR-03741; the Hon. Thomas J. Byrne, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Stephen L. Gentry, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Douglas P. Harvath, Jessica Ball, and Matthew Connors, Assistant State's Attorneys, of counsel), for the People. |