2020 IL App (1st) 171615-U

No. 1-17-1615

Order filed November 5, 2020

Modified upon denial of rehearing December 3, 2020

Fourth Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 19824 |
| | ) | |
| CHRISTOPHER EVERETT, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HALL delivered the judgment of the court.
Presiding Justice Gordon and Justice Lampkin concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm the trial court's denial of defendant's *pro se* motion for leave to file a successive postconviction petition over his contention that newly discovered evidence supported his claim of actual innocence.

¶ 2    Defendant Christopher Everett appeals the denial of his *pro se* motion for leave to file a successive postconviction petition under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122-1 *et seq.* (West 2016)). He argues that the trial court erroneously denied him leave to file a

successive petition where he raised a colorable claim of actual innocence based on newly discovered evidence in the form of two eyewitnesses who supported his claim of self-defense. For the following reasons, we affirm.

¶ 3     Following a bench trial, defendant was convicted of first degree murder for the shooting of Robert A. Locke, attempt first degree murder of Jafar Graves, and five counts of aggravated discharge of a firearm. Defendant was sentenced to an aggregate sentence of 51 years imprisonment: 20 years for first degree murder, a 25-year enhancement for personally discharging a firearm during commission of the murder, a consecutive 6 years for attempt first degree murder, and a concurrent 6-year term for each of the five aggravated discharge of a firearm counts. We set forth the facts of the case in defendant's direct appeal (*People v. Everett*, No. 1-04-1201 (June 30, 2005) (unpublished order pursuant to Supreme Court Rule 23)), and we recite them here to the extent necessary to our disposition.

¶ 4     Defendant was charged with six counts of first-degree murder, eight counts of attempt first degree murder, and five counts of aggravated discharge of a firearm in connection with the shooting death of Locke. At trial, defendant testified that he was acting in self-defense when he shot Locke.

¶ 5     The evidence at trial showed Jafar Graves was dating defendant's estranged wife, Gadealayh (Goody) Norman, whom he met in 1995 and dated for several months before losing contact. Graves and Goody resumed contact in April 2001. Graves knew Goody was married to and separated from defendant, whom he knew by sight. On the evening of June 30, 2001, Graves, and several members of his jazz band, including Locke, arrived at Graves' home after playing a

downtown "gig." Shortly after 8:30 p.m., Graves, Tremaine Dawson, Locke, and two other band members left Graves' home to drive to a recording studio in Graves' car.

¶ 6    While driving, Graves observed defendant sitting on the steps of South Shore Baptist Church at the intersection of Coles Avenue and Cheltenham Place. Graves and defendant stared at each other as Graves drove through the intersection, although Graves testified the other passengers were not aware that he had seen defendant. A few minutes later, Locke told Graves that he believed he left his notebook needed for their recording session at Graves' home. Graves turned around to retrieve the notebook, but on the way back, Locke found it. Graves turned around to proceed to the studio.

¶ 7    On the way back to the studio, Graves again drove toward the intersection where he saw defendant. Graves saw defendant walk diagonally across the street. Defendant stood at the corner when Graves approached the intersection. As he drove through the intersection, defendant started shooting at the vehicle, although Graves did not realize there were shots until the second or third shot hit the car because he was accustomed to hearing gunshots in that neighborhood. The windows in his car were up. Graves turned, and his back windshield shattered. He observed defendant "standing there with the gun pointed." Graves drove faster and told the passengers to duck down. He saw Locke slumped in the backseat with his head back. Graves proceeded to the hospital but was stopped by police at 79th Street and South Shore Drive.

¶ 8    Graves acknowledged he spoke with Ahvicom Norman, defendant's brother-in-law, on the day of the shooting. He denied showing Norman a firearm or making threats against defendant. Graves did not own a gun, have access to a gun, or have possession of a gun on the day of the

shooting. He denied that anyone in his car spoke to defendant on the day of the shooting and did not see anyone in his car with a firearm.

¶ 9    Locke died at Cook County Hospital on July 3, 2001. The parties stipulated that a forensic pathologist would testify he performed Locke's autopsy and concluded the cause of death was a single gunshot wound to the head and the manner of death was homicide.

¶ 10    Tremaine Dawson, a convicted felon, was a passenger in Graves' car during the shooting and generally corroborated Graves' account. On cross-examination, Dawson testified that he did not recall telling police that he was surprised at the circular route Graves drove because it made sense for Graves to take that route.

¶ 11    Chicago police detective Robert McVicker testified that he inspected the scene of the shooting to see if there was any bullet damage on the curb or along the buildings near the intersection of Cheltenham and Coles. There was a car parked near where bullet casings were found but the car did not have any bullet damage. Graves identified defendant as the shooter in a photo array and a physical lineup. McVicker was unable to locate Goody. He obtained a warrant for defendant's arrest. Defendant was eventually located in a jail in the state of Kentucky and transported back to Chicago.

¶ 12    Chicago police forensic investigator William Moore was assigned to process the scene of the shooting and the secondary scene where Graves' car had been pulled over. Moore recovered 10 spent 9-millimeter cartridge casings from the curb and sidewalk at the scene of the shooting. He photographed Graves' car at the secondary scene and examined it for "fired evidence." Moore recovered metal bullet fragments from the dashboard of the car. When investigating the car, Moore did not find any evidence that a firearm had been discharged within it. The parties stipulated that

a forensic scientist who was an expert in the field of firearms and ballistics evidence would testify, if called, that the recovered cartridge cases were found to have been fired from the same firearm.

¶ 13     Ahvicom Norman, defendant's brother-in-law, testified for the defense. Norman testified that his sister Goody "started talking" to Graves during her brief split from defendant. On the date of the shooting, Norman, Graves, and Marcus Reeves drove in Graves' car to a beach to smoke marijuana. Once at the beach, Graves displayed a 9-millimeter handgun, which was stored under the driver's seat, and said defendant had "f*** up" and he was going to kill him. After returning from the beach, Norman warned defendant of Graves' threat.

¶ 14     On cross-examination, Norman acknowledged he did not tell police about Graves' threats following the shooting, nor did he tell anyone about the threats until he was contacted by defense counsel about a year later. He further acknowledged he did not witness the shooting and police did not contact him about it.

¶ 15     Defendant testified that he knew Graves as Norman's and Goody's friend. Following defendant's reconciliation with his wife in June 2001, they returned to Kentucky. Defendant subsequently returned to Chicago and stayed with his grandmother, who lived approximately 50 yards from the scene of the shooting. On the day of the shooting, defendant saw Norman, Reeves, and Graves sitting in a parked car. Norman and Reeves thereafter approached him and informed him that Graves had a gun and had threatened to kill him. Graves then drove away shaking his head and looking at defendant, which he believed confirmed the threat.

¶ 16     Around 8:30 p.m. that day, defendant sat in front of the South Shore Baptist Church and saw Graves drive past him slowly, shaking his head and smirking. The car eventually turned, and defendant walked across the intersection. He then noticed the car had circled back and was driving

in his direction. Defendant noticed Graves had his arm resting on the window with his hand in the shape of a gun and was talking to someone in the backseat. Everyone in the car was looking at defendant. One of the men in the backseat "hollered kill something" and defendant noticed a gun "come up" and the windows "going down." Defendant then "sort of like retreated," pulled his gun out and started shooting at the car because he believed Graves was carrying out the death threat. After he fired a few shots, defendant "heard some other shots." Following the shooting, defendant returned to Kentucky.

¶ 17    On cross-examination, defendant acknowledged that he armed himself with the handgun before going out that evening. He did not attempt to leave the corner when Graves drove past, and the car was driving away from him when he fired at the vehicle. Defendant was the first to fire, and he did not see any gunfire come from the vehicle. He did not go to the police to tell them that he was almost killed.

¶ 18    On redirect, defendant testified that he did not expect Graves to drive by the corner where he was sitting.

¶ 19    The trial court found defendant guilty of the first degree murder of Locke, attempt first degree murder of Graves, and five counts of aggravated discharge of a firearm directed at the vehicle and four occupants. In so finding, the court stated it resolved credibility issues in favor of the State's witnesses and rejected defendant's claim of self-defense. Specifically, the court found the State had proved beyond a reasonable doubt that defendant had neither a justifiable belief nor an unreasonable belief in the need for self-defense. The court sentenced defendant to 45 years in prison for first degree murder, a consecutive 6 years for attempt first-degree murder, and a

concurrent 6-year term for each of the five aggravated discharge of a firearm counts, for a total sentence of 51 years.

¶ 20     On direct appeal, we affirmed but ordered defendant's mittimus be corrected. *Everett,* No. 1-04-1201 (June 30, 2005) (unpublished order pursuant to Supreme Court Rule 23). We also affirmed the summary dismissal of defendant's initial postconviction petition, in which he alleged counsel was ineffective for failing to investigate or present the testimony of eyewitness Ali Knox. *People v. Everett*, No. 1-10-0672 (June 30, 2011) (unpublished order pursuant to Supreme Court Rule 23).

¶ 21     On February 28, 2017, defendant filed the instant *pro se* motion for leave to file a successive postconviction petition, arguing, in relevant part, actual innocence. Specifically, defendant argued Graves' testimony was inconsistent, defendant reasonably believed he needed to defend himself, and newly discovered evidence from Reeves, Kevin Watson, Knox, Norman, and Goody would corroborate his self-defense claim. In support of his motion, defendant attached a successive petition, in which he repeated his claim of actual innocence, and affidavits from Reeves, Knox, and Watson. The Knox affidavit is the same as that submitted with defendant's original 2009 postconviction petition.

¶ 22     In Reeves' affidavit, he averred that he spoke with a pastor and decided to "tell the truth about what happened on June 30, 2001." He corroborated Norman's trial testimony that the two men were in the car with Graves on the day of the shooting, and Graves pulled out a gun and said "how [defendant] f*** up and how he was gonna kill him." Reeves and Norman then exited the car and told defendant about Graves' threat. Graves drove away and looked back "shaking his head

to say, 'yeah, I'm gonna get you.' " Reeves saw defendant with a gun in his hand and knew defendant had a "license or gun card." Reeves had seen Graves with a gun before.

¶ 23    Reeves thereafter went to "76th Coles," where he observed Graves "and his guys" gathered on a porch. One of the men had a gun and "it was like he wanted [Reeves] to see it." Reeves then went into a store on Cheltenham, and when he exited, he saw defendant "coming across the street." Graves and the men from his porch, including the man with the gun, were driving toward defendant with their windows down. Reeves heard someone in the car yell "killa m***" and the man with the gun, who was seated in the backseat, pointed his gun at defendant. Reeves heard gunfire and went back into the store until the shooting ended. He heard "about 13 shots that sounded different, like it was more than one gun." Reeves was afraid for his life and "la[id] low." However, he was "now" no longer afraid and was willing to testify.

¶ 24    Watson averred he was 12 years' old when he witnessed the shooting. He was walking home from the park on Cheltenham and noticed defendant in front of him with his dog. A car full of men pulled up to defendant with their windows down. One of the men "hollered something" and defendant "started shooting really fast." The car thereafter pulled into the intersection, stopped, and then someone from the car fired two or three shots back at defendant through the back windshield, which was missing. Watson heard someone in the car yell "GO-GO…Give me the Gun" while they drove toward 79th Street. Following the shooting, defendant went into an alley and Watson, who had been hiding behind a tree, went home. He was not supposed to be outside at that time, so he did not tell anyone what he had seen until years later because he was afraid of getting in trouble. Watson looked defendant up on google and spoke to a pastor about what he knew "in hopes of finally coming forward to tell what [he had] seen."

¶ 25 On May 19, 2017, the trial court denied defendant leave to file a successive postconviction petition.

¶ 26 On appeal, defendant contends the trial court erred by denying him leave to file a successive postconviction petition because he sufficiently stated a claim of actual innocence based on newly discovered evidence in the form of eyewitnesses Reeves and Watson who supported his claim of self-defense.

¶ 27 The Act permits criminal defendants to challenge their convictions or sentences on grounds of constitutional violations. *People v. Beaman*, 229 Ill. 2d 56, 71 (2008). However, the Act generally contemplates the filing of only one petition. *People v. Ortiz*, 235 Ill. 2d 319, 328 (2009); 725 ILCS 5/122-3 (West 2016). In order to file a successive postconviction petition, a defendant must first obtain "leave of court." See 725 ILCS 5/122-1(f) (West 2016); *People v. Tidwell,* 236 Ill. 2d 150, 157 (2010).

¶ 28 The bar against successive proceedings is relaxed only where the defendant can satisfy (1) the cause and prejudice test of the Act for failing to raise the claim earlier; or (2) the "fundamental miscarriage of justice" exception, set forth as a claim of actual innocence. 725 ILCS 5/122-1(f) (West 2016); *People v. Edwards,* 2012 IL 111711, ¶¶ 22, 23. It is the defendant's burden to obtain leave of court before further proceedings on his successive postconviction claims can follow. *Id.* at ¶ 24.

¶ 29 Where, as in this case, a defendant seeks to relax the bar against successive postconviction petitions on the based on actual innocence, the court should deny such leave only when it is "clear from a review of the petition and supporting documentation that, as a matter of law, the petition cannot set forth a colorable claim of actual innocence." *People v. Robinson*, 2020 IL 123849, ¶ 44.

In other words, the court should grant leave to file a successive petition based on actual innocence where the successive petition and supporting documentation "raises the probability that 'it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence.' " *Edwards,* 2012 IL 111711, ¶ 24 (quoting *Schlup v. Delo*, 513 U.S. 298, 327 (1995)). We review the trial court's denial of leave to file a successive petition *de novo*. *Robinson*, 2020 IL 123849, ¶ 40.

¶ 30    To succeed on a claim of actual innocence, a petitioner must present evidence that is (1) newly discovered, (2) material and noncumulative, and (3) of such a conclusive character that it would probably change the result on retrial. *People v. Coleman*, 2013 IL 113307, ¶ 96 (citing *People v. Washington,* 171 Ill. 2d 475, 489 (1996)).

¶ 31    Newly discovered evidence is evidence discovered after trial that could not have been discovered sooner through the exercise of due diligence. *Robinson*, 2020 IL 123849, ¶ 47.  Material evidence is evidence which is relevant and probative of the defendant's innocence. *Id.* Noncumulative evidence adds to the information presented to the fact finder at trial. *Coleman*, 2013 IL 113307, ¶ 96. (citing *People v. Molstad*, 101 Ill. 2d 128, 135 (1984)).

¶ 32    The conclusive character element refers to evidence that, when considered along with the trial evidence, would probably lead to a different result on retrial. *Id.* ¶ 96 (citing *Ortiz*, 235 Ill. 2d at 336-37). The conclusive character of the new evidence is the most important element of an actual innocence claim.  *Washington*, 171 Ill. 2d at 489. With regard to the conclusive character element, ultimately, we must determine "whether the evidence supporting the postconviction petition places the trial evidence in a different light and undermines the court's confidence in the judgment of guilt." *Robinson*, 2020 IL 123849, ¶ 49 (citing *Coleman*, 2013 IL 113307, ¶ 97). The

new evidence is not required to be "entirely dispositive to be likely to alter the result on retrial." *Id.* "Probability, rather than certainty, is the key in considering whether the fact finder would reach a different result after considering the prior evidence along with the new evidence." *Id.*

¶ 33 Defendant contends that he should be permitted to file a successive postconviction petition based on Reeves' and Watson's affidavits. He claims the affidavits are newly discovered evidence because the two eyewitnesses did not come forward until years after trial. He additionally claims the affidavits are material and noncumulative because they corroborate his claim that he acted in self-defense and undermine Graves' trial testimony that the windows of his car were up and no one in his car had a gun or threatened defendant.

¶ 34 Defendant's affirmative defense of self-defense, if established, would have exonerated him of first degree murder. *See People v. Eveans,* 277 Ill. App. 3d 36, 47 (1996) (noting self-defense is a justifying and exonerating circumstance). To raise a claim of self-defense, a defendant is required to provide some evidence that: (1) unlawful force was threatened against him; (2) he was not the aggressor; (3) the danger of harm was imminent; (4) the use of force was necessary; (5) defendant actually and subjectively believed a danger existed that required the use of the force applied; and (6) his beliefs were objectively reasonable. 720 ILCS 5/7-1 (West 2014); see also *People v. Lee,* 213 Ill. 2d 218, 225 (2004).

¶ 35 Defendant's trial testimony negated his claim of self-defense. He testified he heard a yelled threat from Graves' car, saw a gun raised in the car, he fired shots first, although he saw no shots fired from the car and fired while the car was driving away. Since no one was shooting at defendant and the car was driving away when he fired, the evidence at trial showed the danger of harm was not imminent when he fired at the car, negating his self-defense claim. 720 ILCS 5/7-1 (West

2000) (to raise a claim of self-defense, the defendant must provide evidence, in relevant part, that the danger of harm was imminent); see also *Lee,* 213 Ill. 2d at 225.

¶ 36    Reeves and Watson's affidavits are not so conclusive that they would probably change the result on retrial such that defendant would be found to have acted in self-defense. Nor are they so conclusive that, as defendant now claims as an alternative, he would be found guilty of second degree murder based on unreasonable self-defense. Reeves' proposed testimony was that he warned defendant about Graves' threat to kill him, witnessed someone from Graves' car pointing a gun at defendant, and heard shots that sounded like they came from more than one gun. This testimony merely corroborates portions of defendant's testimony and adds nothing new supporting defendant's self-defense claim.

¶ 37    Unlike Reeves, Watson did see defendant firing his gun. Watson's proposed testimony was that someone in the car yelled at defendant, who responded by "shooting really fast," and the car then pulled forward and someone in the car shot toward defendant two or three times. This evidence corroborates defendant's testimony that he shot first and, in fact, shows defendant apparently responded to a yelled threat with gunfire, thus rebutting defendant's claim of self-defense. Further, Reeves and Watson's averments that they saw or heard gunfire from the car is rebutted by the physical evidence presented at trial, which established the 10 bullet casings recovered at the scene were fired from the same gun. Considering Reeves and Watson's affidavits in light of the evidence presented at trial, we cannot say that the potential testimony from Reeves and Watson would probably change the result on retrial.

¶ 38    Because defendant's own testimony negated his claim of self-defense and Reeves and Watson's affidavits were not so conclusive that they would probably change the result on retrial,

we affirm the judgment of the circuit court of Cook County denying defendant leave to file a successive postconviction petition.

¶ 39    Affirmed.