2022 IL App (1st) 201169

FIRST DISTRICT
SIXTH DIVISION
May 13, 2022

No. 1-20-1169

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 01 CR 19824 |
| | ) | |
| CHRISTOPHER EVERETT, | ) | Honorable |
| | ) | James Michael Obbish, |
| Defendant-Appellant. | ) | Judge Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Pierce and Justice Oden Johnson concurred in the judgment and opinion.

**OPINION**

¶ 1    Defendant, Christopher Everett, appeals the circuit court's denial of leave to file a second successive postconviction petition. On appeal, defendant contends that his petition sufficiently presented a claim that his 51-year sentence violated the proportionate penalties clause as applied to him, where he was 23 years old at the time of the offense and his brain had not reached full maturity or development. For the following reasons, we affirm.

¶ 2                                JURISDICTION

¶ 3    The circuit court denied defendant leave to file a successive petition on September 11, 2020. Defendant mailed his notice of appeal on October 8, 2020, and it was filed on October 15, 2020. Accordingly, this court has jurisdiction pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 651 (eff. July 1, 2017), governing appeals in postconviction proceedings.

¶ 4                                    BACKGROUND

¶ 5       A full accounting of the facts can be found in this court's order involving defendant's direct appeal. See *People v. Everett*, No. 1-04-1201 (2005) (unpublished order under Illinois Supreme Court Rule 23). We set forth only the facts necessary to the disposition of this appeal.

¶ 6       Defendant was charged with first degree murder, attempted first degree murder, and aggravated discharge of a weapon in connection with an incident that occurred on June 30, 2001. On that day, shortly after 8:30 p.m., Robert A. Locke sustained a fatal gunshot wound to his head as he rode in the back seat of a vehicle driven by Jafar Graves. Graves had dated defendant's estranged wife, Gadealayh Norman (Goody).

¶ 7       Prior to the shooting, Graves, Locke, and members of their jazz band were heading from Graves's house to a music recording studio. As Graves drove by the South Shore Baptist Church, he saw defendant sitting on the steps. He and defendant glared at each other before Graves continued past the intersection. A few minutes later, Locke said he was missing his notebook that contained new songs. Graves "doubled back" to his house intending to retrieve the notebook, but then Locke found the book in the car. Graves turned around and dropped off a passenger before heading to the studio.

¶ 8       Graves drove past the church again, and he saw defendant walk diagonally towards the northwest corner of the street. As he proceeded through the intersection, defendant began shooting at his vehicle. Graves made a right turn, and the back windshield shattered. He looked out of his window and saw defendant "standing there with the gun pointed." When he looked toward the back seat, he saw Locke slumped down with his head back. Locke later died at the hospital; his death was ruled a homicide caused by a single gunshot wound to his head.

¶ 9    Police recovered 10 spent shell casings from the shooting scene, and the parties stipulated that all 10 casings were fired from the same handgun. There was no evidence that a firearm had been discharged from within Graves's vehicle. Graves identified defendant as the shooter.

¶ 10    Ahvicom Norman, Goody's brother and defendant's brother-in-law, testified for the defense. He said that Graves and his sister "started talking" during her brief split from defendant. On the day of the shooting, Norman, Graves, and Marcus Reeves were riding in Graves's car to a beach where they planned to smoke marijuana. When they arrived, Graves took out a 9-millimeter handgun from under the driver's seat and threatened to kill defendant because he had "f*** up." After returning home, Norman warned defendant of Graves's threats.

¶ 11    Norman acknowledged that he did not tell police about the threats. Also, he was not present at the time of the shooting. Graves contradicted Norman, denying that he showed Norman a firearm or made any threats. Graves testified that he did not own a firearm and had never handled a 9-millimeter weapon. He stated that no one in his car that night had a firearm.

¶ 12    Defendant testified that he knew Graves as a friend of Norman and of his wife, Goody. He and his wife reconciled in June 2001 and moved to Kentucky. Defendant returned to Chicago for business, and during his visit, he stayed at his grandmother's house. She lived about 50 yards from the scene of the shooting.

¶ 13    On the day of the shooting, defendant saw Norman, Reeves, and Graves sitting in a parked car. Norman and Reeves exited the car and told him that Graves showed them a gun and had threatened to kill defendant. Shortly thereafter, defendant saw Graves drive off shaking his head and looking at him. According to defendant, Graves's behavior confirmed the information he received from Norman and Reeves.

¶ 14    Later that evening, defendant was sitting in front of the South Shore Baptist Church when he saw Graves slowly drive by. Graves was shaking his head and smirking. The vehicle continued down the street and stopped at a stop sign before turning around. Defendant started to walk to the northwest corner of the street when he noticed that the vehicle had circled back and was driving toward him. Graves had his left arm extended and resting on the window. His hand was formed in the shape of a handgun, and he appeared to be talking to people in the back seat. Defendant testified that everyone in the car was looking at him.

¶ 15    Defendant heard someone in the back seat holler "kill something," and he "noticed the gun come up." Defendant shot at the vehicle because he believed Graves was going to carry out his threat to kill him. On cross-examination, defendant admitted that he armed himself before going out that night and he did not attempt to leave the area when he saw Graves drive by. He also acknowledged that he fired at the vehicle as it was driving away from him and that he did not see gunfire coming from inside the vehicle.

¶ 16    The trial court rejected defendant's self-defense claim, resolving credibility issues in favor of the State's witnesses. Defendant was found guilty of six counts of first degree murder, one count of attempted first degree murder, and five counts of aggravated discharge of a firearm. Defendant filed motions for a new trial, which the trial court denied.

¶ 17    Defendant's presentence investigative report (PSI) indicated that he was 23 years old at the time of the offense. He had no prior criminal history and graduated from high school. He was raised by his mother and maternal grandmother, and his early childhood was "pleasant." There was no substance abuse in his family. Defendant saw a psychiatrist four times in the fourth grade due to problems at school, and he described his current physical condition as "good." He married

Goody when he was 21 years old, and they did not have children. Defendant had no problems with drugs or alcohol, and he denied having any affiliation with a street gang. He was "a mentor to the young children in his community." After high school, defendant had several jobs including being a supervisor at a K-Mart and operating machinery at Weldbend Company. He left Weldbend Company to pursue a career in law enforcement.

¶ 18    At the sentencing hearing, two witnesses testified for defendant in mitigation. Reverend Arthur Lyles testified that he was the youth pastor at South Shore Baptist Church and had known defendant for 19 years in that capacity. He stated that defendant had a positive character and avoided drugs, alcohol, and gangs. Defendant was a positive role model for the youth.

¶ 19    Suk Hun Lee testified that he was a professor of business at Loyola University. He also volunteered as a lay chaplain at Division 10 of Cook County jail. Defendant joined his chapel service and Bible group in 2001 and participated in the life learning program. In the program, participants engaged in Bible study in the morning and academic study in the afternoon. Defendant was a group leader and role model for the other inmates.

¶ 20    Defense counsel argued that the shooting was not premeditated and came about due to defendant's "bad state of mind" at the moment because he thought he was in danger. Counsel focused on the PSI showing that defendant had no criminal history or issues with drugs or alcohol and that he was employed for three years prior to his arrest. Defense counsel argued that defendant could make a positive contribution to society and that his threat to the public was slight.

¶ 21    In aggravation, the State argued that defendant found religion "too late" and that he continues to minimize his responsibility in the shooting. His actions also caused serious harm. The State argued that a sentence greater than the minimum would serve to deter others.

¶ 22    The trial court considered "all the matters in mitigation and aggravation that are set forth under Illinois law." It also considered "the facts of the case" and "defendant's rehabilitative potential." The court took into account the testimony of defendant's witnesses at the hearing and defendant's statement to the court. It noted that "a large percentage" of his statement "refers to the defendant not accepting the Court's ruling, and that is his right." The court reiterated its findings that defendant did not have the right to use force that was intended to cause death or great bodily harm to another that night. Although defendant now displayed "a sense of purpose in regard to his faith *** [i]t's obvious that he did not have it the night he fired that nine millimeter ten times."

¶ 23    The trial court sentenced defendant to the minimum sentence of 20 years for first degree murder, a mandatory 25 years for personally discharging a firearm in committing the murder, 6 years for attempted murder, and a concurrent 6-year term for each of the aggravated discharge counts, for a total of 51 years' imprisonment.

¶ 24    In his direct appeal, defendant raised the following issues: (1) the trial court erred in denying his claims of ineffective assistance of counsel, (2) the 25-year statutory firearm enhancement did not apply where the phrase "another person" referred to someone other than the victim, (3) the 25-year firearm enhancement constituted an impermissible double enhancement of his sentence, (4) the firearm enhancement violated the due process and proportionate penalties clauses, and (5) his case should be remanded for proper admonishments under Illinois Supreme Court Rule 605(a) (eff. Oct. 1, 2001). Defendant's convictions and sentence were affirmed in. *Everett*, No. 1-04-1201.

¶ 25    Defendant filed his first postconviction petition on October 7, 2009. Therein, he claimed ineffective assistance of his trial and appellate counsels. The trial court summarily dismissed the

petition, and this court affirmed the dismissal in *People v. Everett*, No. 1-10-0672 (2011) (unpublished order under Illinois Supreme Court Rule 23).

¶ 26    On February 28, 2017, defendant filed a *pro se* motion for leave to file a successive postconviction petition. The petition alleged actual innocence based on newly discovered evidence and that defendant's 6-year sentence for attempted murder was unconstitutional. The trial court denied leave to file the petition, and this court affirmed the denial in *People v. Everett*, 2020 IL App (1st) 171615-U.

¶ 27    Defendant filed a *pro se* motion for leave to a file a second successive petition on October 1, 2018, and filed supplemental motions on December 4, 2018, and October 3, 2019. In these filings, defendant claimed that his 51-year *de facto* life sentence was unconstitutional as applied to him because it was imposed without consideration of the mitigating characteristics of youth. Citing *Miller v. Alabama*, 567 U.S. 460 (2012), the petition alleged that defendant's 51-year sentence for offenses committed when he was 23 years old violated the proportionate penalties clause.

¶ 28    The trial court denied leave to file, finding that "[b]ecause Everett was 23 years old at the time of the offense in this case, he is unable to claim *Miller* protections under either the Eighth Amendment or the Proportionate Penalties Clause as a matter of law." This appeal followed.

¶ 29                                    ANALYSIS

¶ 30    On appeal, defendant contends that the trial court erred in denying him leave to file his second successive petition where he was only 23 years old when he committed the offense and studies have shown that his brain, like those of juvenile defendants, was still developing in areas

relevant to maturity and moral culpability. Therefore, he was entitled to the protections of *Miller* as he claimed in his petition.

¶ 31    The Post-Conviction Hearing Act (Act) provides a method for criminal defendants to assert that "in the proceedings which resulted in his or her conviction there was a substantial denial of his or her rights under the Constitution of the United States or of the State of Illinois or both." 725 ILCS 5/122-1(a)(1) (West 2018). The Act, however, contemplates the filing of only one petition. As a result, "successive postconviction petitions are highly disfavored" by courts. *People v. Bailey*, 2017 IL 121450, ¶ 39. Leave of court must be obtained, upon a showing of cause and prejudice, before defendant can file a successive petition. *Id.*; 725 ILCS 5/122-1(f) (West 2018). To establish "cause," defendant must identify an objective factor external to the defense that impeded his efforts to raise his claim in the earlier proceeding. *People v. Pitsonbarger*, 205 Ill. 2d 444, 462 (2002). To show prejudice, he must "show that the claimed constitutional error so infected his trial that the resulting conviction violated due process." *People v. Morgan*, 212 Ill. 2d 148, 154 (2004). We review the trial court's denial of leave to file a successive petition alleging cause and prejudice *de novo*. *People v. Robinson*, 2020 IL 123849, ¶ 39.

¶ 32    The State concedes that defendant has shown cause, given the lack of authority extending *Miller* to young adults when he filed his initial postconviction petition. Thus, we proceed to address defendant's claim that his 51-year sentence, imposed without due consideration of his youth pursuant to *Miller*, "so infected his trial that the resulting conviction violated due process." See *Morgan*, 212 Ill. 2d at 154.

¶ 33    It is well established under *Miller* and its progeny that a mandatory sentence of life imprisonment for a juvenile offender, with no opportunity to consider the "distinctive attributes of

youth," violates the eighth amendment because such a sentence "poses too great a risk of disproportionate punishment." *Miller*, 567 U.S. at 472, 479. Although *Miller* involved a juvenile's mandatory life sentence, our supreme court found that the reasoning in *Miller* applied equally to juveniles who received any life sentence, whether mandated by statute or upon discretion of the sentencing court. See *People v. Holman*, 2017 IL 120655, ¶ 40. Two years later, the court extended *Miller*'s protections to juveniles who received a *de facto* life sentence, or a sentence of more than 40 years' imprisonment. See *People v. Buffer*, 2019 IL 122327, ¶ 41.

¶ 34     In *Buffer*, the supreme court noted that the imposition of mandatory life sentences for juveniles is prohibited because such sentences do not provide a meaningful opportunity for release " 'based on demonstrated maturity and rehabilitation.' " (Internal quotation marks omitted.) *Id.* ¶ 20 (quoting *Miller*, 567 U.S. at 479). Based on *Miller*'s rationale, the court found that a prison sentence of a term of years, other than life imprisonment, could be "the functional equivalent of life without parole" if it did not provide juvenile defendants a meaningful opportunity for release. *Id.* ¶¶ 29, 41. Extrapolating from recent legislative enactments, the court concluded that "a prison sentence of 40 years or less imposed on a juvenile offender provides some meaningful opportunity to obtain release" and therefore "does not constitute a *de facto* life sentence in violation of the eighth amendment." (Internal quotation marks omitted.) *Id.* ¶ 41.

¶ 35     Although defendant's aggregate sentence of 51 years' imprisonment is a *de facto* life sentence, *Miller* and *Buffer* involved juvenile defendants. Defendant was 23 years old when he shot at Graves's car and killed Locke. Defendant argues, however, that scientific research has shown that the brain continues to develop into a person's mid-twenties and cites articles advocating for the expansion of *Miller* to young adults. Although courts have limited application of *Miller*'s

eighth amendment protections to offenders under 18 years of age, he contends that he has a cognizable claim under the proportionate penalties clause of the Illinois Constitution. Citing *People v. Harris*, 2018 IL 121932, and recent appellate court cases, defendant contends that his successive petition should proceed so he can at least have the opportunity to develop the record regarding his proportionate penalties claim.

¶ 36    *Harris* involved an 18-year-old defendant who was convicted of first degree murder and other offenses and sentenced to a mandatory aggregate sentence of 76 years' imprisonment. *Id.* ¶ 16. He argued that the sentencing scheme mandating a natural or *de facto* life sentence for offenders under the age of 21 years old violated the proportionate penalties clause. *Id.* ¶ 72 (Burke, J., specially concurring). He maintained that the underlying record contained "sufficient information about his personal history to allow the court to consider whether the evolving science on juvenile maturity and brain development relied upon in *Miller* applies to him." *Id.* ¶ 42 (majority opinion).

¶ 37    Our supreme court disagreed. It found that the record contained only "basic information" on the defendant, primarily taken from the presentence investigation report. *Id.* ¶ 46. The trial court did not hold an evidentiary hearing on the issue, nor did it make findings on how the evolving science on juvenile brain development applied to the defendant's specific facts and circumstances. *Id.* Therefore, it found defendant's proportionate penalties contention "premature." *Id.* The court also stated that the defendant's claim was "more appropriately raised" in a postconviction proceeding. *Id.* ¶ 48.

¶ 38    In the recent case of *People v. House*, 2021 IL 125124, our supreme court reaffirmed its holding in *Harris*. In *House*, the 19-year-old defendant was sentenced to a mandatory natural life

imprisonment term for the abduction and shooting deaths of two people, based on a theory of accountability. *Id.* ¶ 5. The defendant filed a postconviction petition alleging, in part, that his mandatory sentence of natural life in prison violated the proportionate penalties clause of the Illinois Constitution. *Id.* ¶ 7.

¶ 39 The supreme court reiterated its statement in *Harris* that "as-applied constitutional challenges are dependent on the specific facts and circumstances of the challenging party" and as a result, the record must " 'be sufficiently developed in terms of those facts and circumstances for purposes of appellate review.' " (Internal quotation marks omitted.) *Id.* ¶ 27 (quoting *Harris*, 2018 IL 121932, ¶ 39). The court found:

> "as in *Harris*, [the defendant] did not provide or cite any evidence relating to how the evolving science on juvenile maturity and brain development applies to his specific facts and circumstances. As a result, no evidentiary hearing was held, and the trial court made no factual findings critical to determining whether the science *** applies equally to young adults, or to [the defendant] specifically, as he argued in the appellate court." *Id.* ¶ 29.

The court noted that the appellate court's opinion "relied on articles from a newspaper and an advocacy group." *Id.* However, the circuit court made no "factual findings concerning the scientific research cited in the articles, the limits of that research, or the competing scientific research, let alone how that research applies to petitioner's characteristics and circumstances." *Id.* The cause was remanded to the circuit court for second-stage postconviction proceedings because "the record in this case requires further development." *Id.* ¶ 32.

¶ 40 Although defendant here cites *Harris* and *House* as support for his argument, there is a significant distinction regarding those cases: the defendants were under the age of 21. Specifically,

- 11 -

the supreme court in *Harris* considered whether *Miller*'s rationale should be extended " 'to young adults ages 18 to 21.' " *Harris*, 2018 IL 121932, ¶ 50. Appellate cases defendant cites on the issue, including *People v. Ruiz*, 2020 IL App (1st) 163145, *People v. Minniefield*, 2020 IL App (1st) 170541, *People v. Bland*, 2020 IL App (3d) 170705, *People v. Franklin*, 2020 IL App (1st) 171628, and *People v. Johnson*, 2020 IL App (1st) 171362, also involved young adult defendants under the age of 21 who sought to challenge their natural or *de facto* life sentences under the proportionate penalties clause. While our legislature has acknowledged the greater capacity for rehabilitation in young adults, and recent statutory enactments reflect the significant weight given to this factor, a clear line is drawn at 21 years of age. See 730 ILCS 5/5-4.5-115(b) (West 2020) (providing that persons under 21 years of age at the time they committed first degree murder shall be eligible for parole after serving 20 years or more of their sentence).

¶ 41    Defendant has not cited any case finding that a defendant who was 23 years old at the time of the offense has shown prejudice for filing a successive postconviction petition based on these arguments. As other courts have noted, at this time no legal, societal, or penological support exists for extending the juvenile protections set forth in *Miller* to young adults over the age of 21. See, *e.g.*, *People v. Suggs*, 2020 IL App (2d) 170632, ¶¶ 33-35; *People v. Humphrey*, 2020 IL App (1st) 172837, ¶¶ 33-34.

¶ 42    We also do not find that defendant's 51-year sentence violated the proportionate penalties clause. The proportionate penalties clause of the Illinois Constitution provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. A sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense

as to shock the moral sense of the community." *People v. Miller*, 202 Ill. 2d 328, 338 (2002). Our supreme court has never defined what constitutes a cruel or degrading sentence that is "wholly disproportionate to the offense" because "as our society evolves, so too do our concepts of elemental decency and fairness which shape the 'moral sense' of the community." *Id.* at 339. To determine whether defendant's sentence is disproportionate, "[w]e review the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." *Id.* at 340.

¶ 43    Here, defendant was given a sentence of 26 years plus a 25-year mandatory firearm enhancement for the shooting death of Locke. A large portion of defendant's sentence is comprised of a 25-year mandatory firearm sentencing enhancement. See 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2010) (requiring that an additional term of between 25 years to natural life imprisonment be added to a sentence if, during the commission the offense, the defendant personally discharged a firearm that proximately caused "great bodily harm, permanent disability, permanent disfigurement, or death to another person"). As this court found in defendant's direct appeal, the enhancement is constitutional under the proportionate penalties clause because it reasonably promoted the legislature's intent to deter the use of firearms when committing felonies. See *Everett*, No. 1-04-1201, slip order at 19-20; see also *People v. Sharpe*, 216 Ill. 2d 481, 525-26 (2005) (finding that the legislature considered the use of firearms during the commission of felonies a serious concern, and the enhanced sentences properly reflect the legislature's intent in this regard).

¶ 44    Nor do we find the aggregate sentence imposed by the trial court in its discretion "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." See *Miller*, 202 Ill. 2d at 338. The evidence at trial showed that defendant went out

that night with a firearm and that he did not leave the area even after he spotted Graves and Graves drove away. When Graves drove past him again, defendant shot 10 times into Graves's car as it was driving away from defendant. No one in the car had a firearm. The court considered the testimony of defendant's witnesses at the sentencing hearing and his rehabilitation potential. It noted that defendant did not fully accept responsibility for shooting Locke and reiterated its finding that defendant did not have the right to use force that was intended to cause death or great bodily harm to another that night. While the court acknowledged defendant's "sense of purpose in regard to his faith *** [i]t's obvious that he did not have it the night he fired that nine millimeter ten times."

¶ 45     The trial court also considered defendant's rehabilitation potential. A review of the record shows that defendant graduated from high school and was involved with his church for much of his life leading up to the shooting. He had no prior criminal history and no problems with drugs or alcohol. He got married, had a job, and was "a mentor to the young children in his community." His pastor testified that he had known defendant for 19 years and observed his positive character and his avoidance of drugs, alcohol, and gangs. He found defendant to be a positive role model for the youth. Suk Hun Lee, the lay chaplain at Division 10 of Cook County jail, testified that defendant participated in the Life Learning Program and was a group leader and role model for the other inmates.

¶ 46     The fact that the trial court imposed the minimum sentences of 20 years' imprisonment for defendant's first degree murder conviction and 6 years' imprisonment for his attempted murder conviction, against the wishes of the State, shows it gave significant consideration to defendant's capacity for rehabilitation and other mitigating factors. See 730 ILCS 5/5-4.5-20(a) (West 2010)

(stating the sentencing range for murder is 20 to 60 years); *id.* § 5-4.5-25(a) (providing that the minimum sentence for a Class X felony is "not less than 6 years and not more than 30 years").

¶ 47    Under current state law and the facts of this case, we find that defendant does not meet the prejudice standard for his as-applied proportionate penalties claim. Leave of court to file a successive postconviction petition should be denied when it is clear, from a review of the successive petition and the documentation submitted by defendant, that the petition does not adequately allege facts demonstrating cause and prejudice. *People v. Smith*, 2014 IL 115946, ¶ 35. Accordingly, we affirm the denial of defendant's motion for leave to file a successive petition raising his proportionate penalties claim.

¶ 48                                          CONCLUSION

¶ 49    For the foregoing reasons, we affirm the circuit court's denial of leave to file defendant's second successive postconviction petition.

¶ 50    Affirmed.

**No. 1-20-1169**

| | |
|---|---|
| **Cite as:** | *People v. Everett*, 2022 IL App (1st) 201169 |
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 01-CR-19824; the Hon. James Michael Obbish, Judge, presiding. |
| **Attorneys for Appellant:** | James E. Chadd, Douglas R. Hoff, and Adrienne N. River, of State Appellate Defender's Office, of Chicago, for appellant. |
| **Attorneys for Appellee:** | Kimberly M. Foxx, State's Attorney, of Chicago (Enrique Abraham, Matthew Connors, and Jessica R. Ball, Assistant State's Attorneys, of counsel), for the People. |