2026 IL App (1st) 240930-U

No. 1-24-0930

Order filed January 26, 2026

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 18 CR 08867 |
| | ) | |
| GONZALO SAHAGUN, | ) | Honorable |
| | ) | Kenneth J. Wadas, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE COBBS delivered the judgment of the court.
Presiding Justice Fitzgerald Smith and Justice Howse concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's sentence over his claim that his counsel was ineffective for not calling an expert witness to testify at sentencing that defendant's brain was akin to a juvenile's at the time of the offense.

¶ 2    Following a jury trial, defendant Gonzalo Sahagun was found guilty of two counts of first degree murder while personally discharging a firearm. The trial court imposed natural life in prison on each count. On appeal, defendant argues his trial counsel was ineffective for failing to call an expert witness to testify at sentencing that defendant's brain was akin to a juvenile's at the time of

the offense, such that a sentence of natural life would violate the proportionate penalties clause of the Illinois Constitution. We affirm.

¶ 3    Defendant was charged by indictment with 12 counts of first degree murder related to the April 19, 2014, deaths of Anthony Bankhead and Jordan Means.

¶ 4    At trial in 2023, Justin Hamilton testified that he provided his testimony pursuant to a plea bargain for two counts of conspiracy to commit first degree murder related to the present case and dismissal of a firearm charge in a separate case. In 2014, Hamilton, defendant, Bankhead, and Means were members of the Latin Kings gang. On April 18, 2014, Bankhead and Means broke into Hamilton's vehicle, resulting in two physical fights that involved defendant. On April 19, 2014, after the second "tussle," Hamilton believed the gang would order a "violation" against them for the fights, and defendant said, "I'm tired of this crap." Later, Bankhead, Means, Hamilton, defendant, and fellow Latin Kings member Mario Picazo met at a basement apartment on South Houston Avenue. After "mak[ing] amends," Hamilton, Picazo, and defendant decided to leave. As Hamilton walked to the door, however, defendant pointed a firearm at Bankhead. Defendant pulled the trigger, but the firearm did not fire; he pulled it again and fatally shot Bankhead. Defendant then approached and fatally shot Means.

¶ 5    Picazo testified that he was "trying to leave" the Houston Avenue apartment when he heard "clicks and a gun go off." He turned and saw Bankhead fall but did not see who shot Bankhead. Picazo ducked, heard another shot, and saw Means fall, but likewise did not see who shot Means. On April 21, 2014, Picazo identified defendant in a photo array. Picazo testified that he only identified defendant's photo in response to the question, "who [is] Gonzalo Sahagun."

¶ 6 Former Assistant State's Attorney Jamie Santini testified that he questioned Picazo before a grand jury. He read parts of Picazo's grand jury testimony in which Picazo stated he saw defendant shoot Bankhead and Means.

¶ 7 Ariel Jackson testified that she, her boyfriend, and her boyfriend's younger cousin were in a bedroom of the Houston Avenue apartment when Bankhead, Means, Hamilton, Picazo, and defendant entered the apartment. Jackson heard two gunshots and ran into a closet. Defendant then entered the room and stated, "I'm sorry this happened inside the house, but [Means] and Bankhead just got shot." Jackson exited the room and saw Bankhead's and Means's bodies. Later that night, Jackson again encountered defendant, who told her he shot Bankhead and Means because they were "coming for his gun" and "we had to do what we had to do." Defendant asked Jackson to "cover for him" and tell the Latin Kings that he was not present when Bankhead and Means were shot.

¶ 8 Chicago police sergeant Isaac Lambert testified that he obtained a warrant for defendant's arrest on April 22, 2014, but defendant was not arrested until June 13, 2018, when he arrived at O'Hare airport on a flight from Mexico.

¶ 9 Defendant testified that he shot Bankhead in self-defense. At the Houston Avenue apartment, Bankhead discussed "going to war with the Latin Kings" and shared a plan to kill a "ranking officer." Defendant said he wanted "nothing to do with it" and told Bankhead, "f*** you and f*** what you stand for." Bankhead then reached for his breast pocket, which defendant knew contained a firearm. Defendant drew his firearm and pulled the trigger, but it "jammed," so he pulled the trigger again and shot Bankhead in the face. Defendant approached Means, who was "fidgeting back and forth," and told him to drop his firearm. Means "lunged" toward defendant

and Means's head hit defendant's firearm, causing it to discharge. Defendant then fled to Mexico because he feared retaliation from the Latin Kings.

¶ 10    The jury found defendant guilty of first degree murder of Bankhead and Means while personally discharging a firearm.

¶ 11    Prior to sentencing, defendant's attorney submitted a memorandum, which was later amended following the submission of an updated presentencing investigation (PSI) report, arguing that a mandatory natural life sentence would violate the eighth amendment of the United States Constitution and the proportionate penalties clause of the Illinois Constitution due to defendant's status as a 21-year-old emerging adult at the time of the offense, citing *People v. House*, 2021 IL 125124. On this basis, counsel requested the court apply the juvenile sentencing mitigation factors set forth in *Miller v. Alabama*, 567 U.S. 460 (2012), and codified in the Unified Code of Corrections, arguing those factors favored leniency. See Pub. Act 99-69, § 10, (eff. Jan. 1, 2016) (adding 730 ILCS 5/5-4.5-105). Specifically, defendant was unable to appreciate the risks inherent in his actions due to his underdeveloped brain; was subject to gang pressure; was raised in a high crime area; had a high rehabilitative potential as demonstrated by his good behavior in jail; and, at the time of the offense, was "confronted with deadly force" and feared for his safety. Counsel referenced throughout the memorandum a white paper that explained the brain continues to mature into the early 20s and the ongoing brain development has profound implications for decision-making, self-control, and emotional processing. Counsel then correlated all of defendant's actions in committing this offense to immaturity, inability to appreciate risks, and inability to regulate his emotions. Counsel also attached certificates defendant had earned while incarcerated for completing religious, educational, and mental health programming, and letters

from prison personnel and a friend describing his good character. Counsel requested that the trial court exercise its discretion in departing from the statute and impose a sentence of 26 years in prison, rather than the minimum of natural life.

¶ 12    Defendant's PSI reflected that, at the time of the offense, he had been released on bond pending a charge of aggravated unlawful use of a weapon.

¶ 13    At the sentencing hearing, defense counsel's arguments were substantially the same as those in his memorandum.

¶ 14    In allocution, defendant apologized to Bankhead's and Means's families and stated, "I would like the People to know that I am no longer the same person who committed these senseless acts. I've turned my life around and become a productive peaceful member of society behind these walls."

¶ 15    In imposing the sentence, the court emphasized that the minimum sentence for one murder was 45 years to life, and defendant had committed two murders while on bond for a firearm charge. The court responded to defendant's mitigation arguments, specifically stating that the jury considered whether defendant acted recklessly, in self-defense, or under strong provocation and rejected those arguments. The court also stated that it did not think defendant testified truthfully. Regarding the science on brain development, the court acknowledged the white paper but stated:

> "[W]here is the actual evidence, the physical evidence, testimony from a witness that says that this – in this particular case he's the type of individual that should be considered for someone whose brain development was not there yet at the time that he committed this offense even though there's nothing in his background to indicate that he was somehow deprived of a good life.

This isn't a situation where it was a one-parent family, the mother was on drugs and he was living on the streets and had no choice and his brain was not developed and, therefore, he made his choice based on these types of pressures. I don't agree with that at all that that was in this case[.]"

The court also considered the defense's arguments pursuant to *House*,[1] but stated, "[t]he facts of *House* are not even close to the facts of this case." Ultimately, the court concluded the evidence in aggravation outweighed that in mitigation, stating, "I think the defendant's acts were heartless and merciless. I think that the defendant knew exactly what he was doing and *** the suggestion that the defendant should get 26 years in the Illinois Department of Corrections, on two murders, is an insult." The court imposed natural life in prison on each count. Defense counsel made a motion to reconsider the sentence, which the court denied.

¶ 16 Defendant appeals, arguing his counsel was ineffective for failing to call an expert witness at sentencing to support the argument that defendant's brain at 21 years old resembled that of a juvenile, such that a mandatory sentence of natural life in prison would violate the proportionate penalties clause of the Illinois Constitution. Defendant contends his counsel misunderstood *House* to hold that juvenile sentencing factors "would automatically apply" to defendant, whereas *House* in fact requires emerging adult defendants to prove they were akin to juveniles at the time of the offense.

¶ 17 In response, the State argues counsel was not deficient where nothing in the record suggested that defendant's mental state at the time of the offense was akin to a juvenile's. Further,

---

[1]The trial judge in the instant case was also the judge in *House* and therefore was familiar with the litigation and appellate rulings issued in that case.

defendant cannot demonstrate prejudice because this court has rejected such challenges to natural life sentences for defendants age 21 or older who are convicted of multiple murders.

¶ 18    In reviewing a claim of ineffective assistance, we apply the test set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), which asks (1) whether trial counsel's performance was deficient and (2) whether the deficiency prejudiced the defendant. See *People v. Albanese*, 104 Ill. 2d 504, 525-27 (1984) (adopting *Strickland*). Failure to establish either prong precludes a finding of ineffective assistance. *People v. Cherry*, 2016 IL 118728, ¶ 24. To establish ineffective assistance in this sentencing context, a defendant must show that, but for trial counsel's failure to present certain mitigating evidence, the defendant would have received a lighter sentence. *People v. Tuduj*, 2014 IL App (1st) 092536, ¶ 102. Conjecture or speculation cannot establish prejudice. *Id.*

¶ 19    The proportionate penalties clause provides, "All penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. Generally, a sentence violates the proportionate penalties clause if it is "cruel, degrading, or so wholly disproportionate to the offense as to shock the moral sense of the community." (Internal quotation marks omitted.) *People v. Williams*, 2024 IL 127304, ¶ 24. In applying this standard, we consider "the gravity of the defendant's offense in connection with the severity of the statutorily mandated sentence within our community's evolving standard of decency." (Internal quotation marks omitted.) *Id.*

¶ 20    The mandatory minimum sentence for a defendant convicted of multiple murders is natural life in prison, "irrespective of the defendant's age at the time of the commission of the offense." 730 ILCS 5/5-8-1(a)(1)(c)(ii) (West 2014). Our supreme court, however, has not foreclosed the

possibility that offenders 18 and 19 years of age may raise an as-applied proportionate penalties clause challenge based on *Miller*. See *People v. Clark*, 2023 IL 127273, ¶ 87. In *House*, for example, the supreme court remanded proceedings on a postconviction petition for a factual finding as to whether a 19-year-old defendant's mandatory life sentence violated the proportionate penalties clause. *House*, 2021 IL 125124, ¶¶ 29-32.

¶ 21    Nonetheless, even assuming defendant's trial counsel could have found an expert to testify regarding defendant's status as an emerging adult, defendant cannot demonstrate that counsel's failure to do so prejudiced defendant, as he was 21 years old at the time of the offense. This court has generally held that offenders 21 years of age and older are adults who cannot invoke *Miller* to sustain a proportionate penalties challenge to a life sentence. See *People v. Green*, 2022 IL App (1st) 200749, ¶¶ 37-42 (reviewing cases). For instance, in *Green*, this court stated that "the line of adulthood has been drawn at age 21" in finding the "defendant was 21 years old at the time of the offense, and therefore was an adult for purposes of a *Miller* claim." *Id.* ¶ 42; see also *People v. Everett*, 2022 IL App (1st) 201169, ¶ 40 ("While our legislature has acknowledged the greater capacity for rehabilitation in young adults *** a clear line is drawn at 21 years of age"); *People v. Suggs*, 2020 IL App (2d) 170632, ¶ 35 ("it is a much greater leap to extend [*Miller*] to a 21-year-old"); see also *People v. Humphrey*, 2020 IL App (1st) 172837, ¶¶ 33-34, *abrogated on other grounds by People v. English*, 2023 IL 128077, (justifying threshold of 21 years because, among other reasons, a person under the age of 21 when he commits first degree murder is now eligible for parole review after serving 20 years).

¶ 22    Defendant relies on *People v. Estrada*, 2024 IL App (1st) 230029-U, an unpublished order in which this court reversed the defendant's sentence and remanded for a new sentencing hearing

where defense counsel put forth a *Miller* claim but "inexplicabl[y] fail[ed] to provide any factual or legal evidence regarding the defendant's immaturity" to support the claim. See *id.* ¶ 56. Notably, Estrada was 23 years old at the time of the offense. *Id.* ¶ 23. This court found, based on the circuit court's acknowledgment that it was "limited by the nearly non-existent evidence offered by defense counsel," that it was reasonably probable that counsel's failure to present appropriate evidence affected the sentence. *Id.* ¶ 56. The *Estrada* majority rejected the demarcation of 21 years for a *Miller* claim, disagreeing with *Green*. *Id.* ¶ 58. A dissenting justice argued that evidence did not show the sentence would have been lesser absent counsel's alleged deficiencies, stating, "No Illinois court has ever reduced the sentence of a 23-year-old based on the proportionate penalties clause." *Id.* ¶¶ 70-73 (Coghlan, J., dissenting).

¶ 23    We follow *Green* in holding that, in this case, even if an expert testified that defendant's brain resembled that of a juvenile, the *Miller* rule would not apply to defendant because he was 21 years old at the time of the murders and thus a legal adult for purposes of a proportionate penalties clause challenge. See *Green*, 2022 IL App (1st) 200749, ¶ 42.

¶ 24    Notwithstanding the 21-year-old demarcation line, we find the facts and circumstances of *Estrada* distinguishable, warranting a different outcome here.

¶ 25    First, counsel's assistance in this case was certainly reasonable in comparison to the assistance, or lack thereof, provided to the defendant in *Estrada*. There, despite the sentencing court's order for the creation of a new PSI, defense counsel did not ensure that that was completed, and thus, the sentencing court effectively only had the PSI created almost 15 years prior. *Id.* ¶¶ 20-

21, 51.[2] Additionally, in imposing the sentence, the court stated that "simply arguing that your brain was not developed at 23 and that I should therefore ignore the enhancements" is insufficient. *Id.* ¶ 37. Notably, the court's assessment of counsel's representation was not an exaggeration. In *Estrada*, defense counsel's sentencing memorandum was barebones, non-specific to the defendant, and contained merely a single sentence that the defendant was 23 years old and "[t]he research shows that the brain is still immature until 25 years of age." *Id.* ¶ 23. Additionally, the memorandum discussed, at length, *People v. House*, 2019 IL App (1st) 110580-B, *reversed in part, vacated in part by* 2021 IL 125124, which had been reversed and vacated by the supreme court nearly a year prior to the filing of that memorandum. *Id.* ¶¶ 23, 52. Thus, defense counsel utterly failed to argue in defendant's favor under the current state of the law on youthful offenders. See *id.* ¶ 53. It is no surprise then that the *Estrada* court found "counsel's performance was objectively unreasonable and therefore deficient." *Id.* ¶ 54.

¶ 26    In contrast, here, defense counsel's sentencing memorandum, which was amended following an updated PSI, accurately cited to the supreme court's *House* decision, repeatedly referenced a white paper on brain development in late adolescence, specifically tied each aspect of defendant's factual background and the circumstances of his offense to that science, and addressed, in detail, each *Miller* factor. Neither defense counsel's memorandum nor argument at the hearing could be construed as barebones or non-specific to defendant. Although counsel did not retain an expert witness, his performance could not be considered deficient in this case, as compared to that rendered in *Estrada*.

---

[2]An investigating officer attempted to interview the defendant for a new PSI, but the process was halted when the defendant informed the officer that he was awaiting the appointment of counsel and wished to confer with new counsel before proceeding with the PSI. *Id.* ¶ 20.

¶ 27   Second in *Estrada*, the sentencing court acknowledged the defendant's rehabilitative efforts but repeatedly stated that the complete lack of evidence and argument prevented it from ignoring the statutory minimum sentence. *Id.* ¶ 37. For that reason, this court found that "the defendant's sentence was dictated by defense counsel's inexplicable failure to provide any factual or legal evidence regarding the defendant's immaturity" and concluded that there was a reasonable probability that but for counsel's deficient performance, the court would have imposed a lesser sentence." *Id.* ¶ 56.

¶ 28   Unlike in *Estrada*, the court expressed no reservations about imposing the mandatory minimum sentence. On the contrary, it stated that "defendant's acts were heartless and merciless" and "the suggestion that the defendant should get 26 years in the Illinois Department of Corrections, on two murders, is an insult." We acknowledge that the court made an isolated statement that no expert testimony had been presented to demonstrate that defendant's "brain development was not there yet at the time that he committed this offense[.]" However, the court's statement was tempered by its own recognition that defendant's background did not contain any signifiers commonly associated with delayed brain development.

¶ 29   Contrary to *Estrada*, nothing in this record indicates that expert testimony about the developing neuroscience of emerging adulthood as applied to defendant could have caused the trial court to impose a sentence below the statutory minimum of natural life in prison. The trial court considered defendant's arguments regarding his status as an emerging adult, found *House* was inapposite, and expressly concluded that the evidence in aggravation outweighed that in mitigation. Further, we decline to fashion a rule which would require the presentation of an expert

witness when the evidence available to the trier of fact is otherwise sufficient to determine the facts in issue. Neither do we read *Estrada* as standing for such a proposition.

¶ 30    Finally, the court also expressly found defendant's testimony not credible and rejected many of defendant's mitigation arguments, as the jury had already rejected his claims of self-defense, provocation, and recklessness. On this record, there is no reasonable probability that any additional efforts by counsel would have resulted in a lighter sentence.

¶ 31     Thus, defendant cannot demonstrate that his counsel's decision not to call an expert witness prejudiced him, and his ineffective assistance claim fails. See *Cherry*, 2016 IL 118728, ¶ 24 (failure to establish either prong precludes a finding of ineffective assistance).

¶ 32    For these reasons, we affirm the judgment of the trial court.

¶ 33    Affirmed.